**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ADCOR INDUS., INC.,** | ) | **Case No.  1:03 CV 1901** |
| | ) | |
| **Plaintiff,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **BEVCORP, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the Court on the following remaining claims in this case:[1] Count I is a claim for theft or conversion of trade secrets in violation of O.R.C. §§ 1333.61 to 1333.69.  Count IV is a claim for breach of a consent decree, and Count V is a claim for conspiracy to breach the consent decree.

Count I is before the Court on Bevcorp, LLC and the Connelly Defendants' Motion for Summary Judgment (the "Summary Judgment Motion") (**ECF No. 135**).  The Motion was filed by Defendants Michael and Victoria Connelly, Miconvi Industries, Inc. and Miconvi Properties, LLC, and Bevcorp, LLC (collectively, "the Connelly Defendants").  The Connelly Defendants ask the Court to dismiss as untimely Plaintiff Adcor Industries, Inc.'s ("Adcor") claim against them for misappropriation of trade secrets.  Because the Court concludes that the misappropriation claim accrued more than four years before Adcor filed its

---

[1]*See* discussion of procedural facts, *infra*, at 6.

initial complaint,

the Court **GRANTS** the Summary Judgment Motion for the reasons set forth in Section II below.

Furthermore, although Defendants Haag and Romp did not file a summary judgment motion with

respect to Count I, the Court is nonetheless entering judgment in their favor and against Adcor

for the reasons set forth in Section II(D).  Thus, Count I is **DISMISSED WITH PREJUDICE**

**IN ITS ENTIRETY**.

　　　　　　Counts IV and V were severed and tried to the Court as a motion for contempt in

hearings held on April 27, 2005 and June 22, 2005.  The Court has heard the evidence, reviewed

the parties' numerous filings and concludes, for the reasons set forth in Section III below, that

Adcor's motion for contempt must be **GRANTED** with respect to Defendants Haag and Romp.

*See also briefing schedule infra*, at 35.  The Court is deferring ruling on this motion with respect

to Defendants Michael and Victoria Connelly, Miconvi Industries, Inc. and Miconvi Properties,

LLC, and Bevcorp, LLC, pending discovery.  The Court is also deferring its ruling with respect

to the conspiracy claim presented in Count V pending discovery.

## I.

　　　　　　This case arises from an Agreed Judgment Entry and Order entered on March 4,

1988 by Judge Alvin I. Krenzler in a case captioned *Crown Cork & Seal Co, Inc v Brau Mfg,*

*Inc, Haag & Romp Design Engineering Consultants, Baron Haag and Chester Romp*, Case No.

C87-3300.  *See Am. Compl., Ex. A* ("Consent Decree").   Baron Haag and Chester Romp,

defendants in the instant case, were defendants in the *Crown Cork & Seal* case, along with the

companies they owned, Brau Manufacturing and Haag & Romp Design Engineering Consultants

(collectively, "the Brau Defendants").

In the Consent Decree, the Brau Defendants admitted that they knowingly and intentionally solicited, procured and paid employees of Crown Cork & Seal (hereafter, "Crown") and their family members $300,000 to obtain its trade secrets and other proprietary information beginning as early as 1964 and continuing through 1987.  *Consent Decree* ¶¶ 1-6.  They admitted that they used Crown drawings to manufacture replacement parts for equipment originally manufactured by Crown, and that they used Crown drawings to create their own drawings for the same parts.  *Id.* ¶ 3.  They admitted that they used both company and personal funds to misappropriate the trade secrets, and that the converted information enabled them to compete unfairly with Crown.  *Id.*

The Consent Decree allowed the Brau Defendants to "remain in the business of repairing and reconditioning fillers and other beverage equipment, including equipment manufactured by Crown.  *Consent Decree* ¶ 10.  However, the Decree absolutely prohibited them from manufacturing or obtaining "other than from Crown, any Crown parts for this purpose," and "from using in any manner whatsoever in connection with any such repairing or reconditioning business or at any time in the future any of the trade secrets or confidential, proprietary information and knowledge obtained from Crown."  *Id.*  The Brau Defendants agreed "to inform their employees, customers, the trade and the public . . . that they have forever withdrawn from the business of manufacturing Crown parts, and that to the extent such parts will be required in their repair or reconditioning work, [they] will use only genuine Crown parts purchased directly from Crown."  *Id.* ¶ 11(d).  The parties agreed that the term "Crown parts" should be given the "broadest possible construction," *id.* ¶ 9, and that the Decree should be construed "expansively" in Crown's favor and against the Brau Defendants, *id.* ¶ 16.

-3-

The Consent Decree required the Brau Defendants to return to Crown, within ten days of the Decree's issuance, all Crown drawings and other proprietary materials and their inventories of finished and unfinished Crown products, and to pay to Crown the sum of $2,225,000.00.  *Consent Decree* ¶ 11.  The Decree forever barred the Brau Defendants from possessing, reproducing or replicating any documents referring, relating or pertaining to the manufacture of Crown parts, and it required them to immediately turn over to Crown any such documents coming into their possession in the future.  *Id*. ¶ 12.

The Consent Decree gave Crown broad policing powers.  The Brau Defendants agreed " that Crown may police [their] compliance with the terms of this agreement for so long as they or any of them remain in business, by any and all means which Crown deems necessary or appropriate" including review of "all . . . documents of any sort whatsoever, maintained by the defendants, . . . in connection with any activity or undertaking engaged in by them" and "visits and inspections, both announced and unannounced . . ."  *Consent Decree* ¶¶ 13(a), (b)).  The Consent Decree also gave Crown the right, "through counsel or other representatives, to question any person or persons formerly, presently or hereafter employed by the defendants, or any of them or any of defendant's agents or representatives, in connection with any business activity . . ."  *Id*. ¶ 13(c).

By its own terms, the Consent Decree applied not only to the Brau Defendants but to "each and every of their respective successors, assigns, affiliates, agents, representatives, heirs, administrators, executors, family members, and any person dealing directly or indirectly through them or in concert with them."  *Consent Decree*, ¶ 7.  Moreover, the Brau Defendants agreed that, "[i]n the event of any sale or assignment of either the stock or assets of Brau or Haag

-4-

& Romp, or either of them, this prohibition shall continue against any acquiring or successor entity." *Id.* ¶ 9.

In 1991, Defendants Michael and Victoria Connelly, respectively a lead mechanic and executive secretary for Brau Manufacturing ("Brau"), incorporated a company under the name Bevcorp Industries, Inc. ("Bevcorp Industries" or "Bevcorp") while still working at Brau. Bevcorp Industries was created to service, refurbish and sell replacement parts for, among other things, Crown beverage fillers. *See ECF No. 99* at 2. The Connellys continued to work for Brau until 1992, when they left Brau to devote their full time to Bevcorp Industries.

In 1997, Simplimatic, Inc. purchased Crown's Machinery Division and the resulting company became known as Crown Simplimatic, Inc. ("Crown Simplimatic").

In 1998, Crown Simplimatic sued Adcor (the plaintiff in this case and a Crown competitor at the time), claiming that Adcor had misappropriated Crown drawings relating to a valve body which, Crown Simplimatic claimed, could not be made without Crown drawings.[2] The parties eventually settled that case and, in December 2000, Adcor acquired the assets of the Crown entities, including the Crown drawings, out of bankruptcy.

Meanwhile, in April 2000, the Connellys formed Bevcorp Properties, LLC ("Bevcorp Properties") to purchase and hold real estate and, in May 2000, bought the real estate and certain equipment of Brau. Shortly thereafter, at the Brau Defendants' request, the Connellys moved everything they didn't purchase to a Willoughby, Ohio storage facility rented by Haag and Romp.

---

[2]Depositions taken in the 1998 case will hereafter be cited as "CSI [Name of Deponent] Dep."

In November 2002, a company called Enprotech Corporation purchased the assets of Bevcorp Industries and formed an entity called Bevcorp, LLC.  The Connellys became officers of Bevcorp, LLC upon its formation.  Bevcorp Industries changed its name to Miconvi Industries, Inc. ("Miconvi Industries"), and Bevcorp Properties changed its name to Miconvi Properties, LLC ("Miconvi Properties").  Miconvi Properties leases to Bevcorp, LLC the real estate where
the Bevcorp facility is now located and which was once owned and operated by Brau

On September 9, 2003, Adcor filed a four-count complaint against Defendants Bevcorp, LLC, the Connellys, Miconvi Industries and Miconvi Properties, and Baron Haag and Chester Romp.  *ECF No. 1* ("Compl.").  On December 12, 2003, Adcor filed an amended complaint alleging five claims.  *ECF No. 55* ("Am. Compl.").  The Court subsequently dismissed with prejudice Counts II and III of the Amended Complaint, *ECF No. 57*, leaving Counts I (trade secret misappropriation), IV (breach of consent decree) and V (conspiracy to breach the consent decree) pending.  The contempt claims (Counts IV and V) were severed and tried to the Court on April 27, 2005, at the conclusion of which the Court directed the parties to file post-hearing briefs.  The transcript for the April 27th hearing is located at *ECF No. 138* ("Init'l Contempt Hr'g Tr.").

While the Court was in the process of preparing a ruling, Adcor filed a request for an emergency hearing and sanctions based on its having located business records and approximately 1,100 Crown or Crown-derivative drawings (also referred to as "Brau drawings") in a safe in Haag and Romp's Willoughby storage facility, which facility was identified by Romp during the April 27th contempt hearing.  *ECF No. 145*.  The Court granted Adcor's request and

held a supplemental contempt hearing on June 22, 2005.  The transcript for the June 22nd

hearing is located at *ECF No. 147* ("Supp'l Contempt Hr'g Tr.").  During the hearing, Adcor

produced the drawings.  *Id.*  In addition, Adcor presented evidence suggesting that Brau

drawings migrated to one of Bevcorp's customers through Bevcorp.  *See Supp'l Contempt Hr'g*

*Tr.* at 125-158.  At the conclusion of the hearing, the Court allowed the parties to file post-

hearing briefs.              Having the numerous briefs, the evidence attached thereto and the

entire record, the Court is prepared to issue its rulings on Counts I, IV and V.

## II.    COUNT I  –  Misappropriation of Trade Secrets

### A.    Summary Judgment Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  All facts and inferences drawn therefrom must be

viewed in a light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 255 (1986); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997).  If, after

reviewing the record as a whole, a rational fact finder could not find for the nonmoving party,

summary judgment is appropriate since there is no genuine issue of material fact for

determination at trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).

The moving party has the initial burden of proving that no genuine issue of fact

exists and that the moving party is entitled to judgment as a matter of law.  *Vaughn v.*

*Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir.2001) (citing *Street v. J.C. Bradford &*

*Co.*, 886 F.2d 1472, 1477 (6th Cir.1989)).  To meet this burden, the moving party may rely on

any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the

nonmoving party to produce any evidence which would create a genuine dispute for the jury.

*Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir.1995) (citing *Street v. J.C. Bradford*

*& Co.*, 886 F.2d at 1477).

      If the moving party satisfies its burden, then the burden of going forward shifts to

the nonmoving party to produce evidence that results in a conflict of material fact to be resolved

by a jury.  *Cox*, 53 F.3d at 148.  A scintilla of evidence in support of the nonmoving party's

position is not enough.  *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 102

(6th Cir.1995) (citing *Anderson*, 477 U.S. at 252).  There must be evidence from which a

reasonable jury could find for the nonmoving party.  *Id.*  If the evidence is insufficient to

reasonably support a verdict in favor of the nonmoving party, the motion for summary judgment

must be granted.  *Cox*, 53 F.3d at 150.

### B.    Relevant Law

      Adcor's claim for trade secret misappropriation is brought under Ohio's version of

the Uniform Trade Secrets Act ("UTSA"), O.R.C. §§ 1333.61 *et seq*. (the "Ohio Act").  The

relevant limitations statute provides that:

> [a]n action for misappropriation of trade secrets shall be
> commenced within four years after the misappropriation is
> discovered or by the exercise of reasonable diligence should have
> been discovered.  For the purposes of this section, a continuing
> misappropriation constitutes a single claim.

O.R.C. § 1333.66.

      There is no dispute that this four-year statute of limitations applies to Adcor's

-8-

misappropriation claim.  There is also no dispute that Adcor is subject to all the defenses that could have been raised by the defendants against Adcor's predecessors-in-interest, Crown and Crown Simplimatic.[3]  Adcor argues, however, that in order for the statute of limitations to accrue, "there must be <u>actual knowledge</u> of a misappropriation or <u>evidence</u> of misappropriation such that the complaining party should have known of the misappropriation."  *ECF No. 142* ("Adcor Opp. Br.") at 1 (emphasis added).  Based on this position, Adcor argues that the statute of limitations did not accrue until some time in 2003 at the earliest[4] or May 2005 at the latest.[5] This position lacks merit.

The plain language of the limitations statute does not support Adcor's interpretation.  The statute does not require that a misappropriation claim be commenced within four years after a plaintiff has actual knowledge or evidence of a misappropriation.  Rather, it requires that a claim must be commenced "within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  In other words, the Ohio Act incorporates the discovery rule.

---

[3]*See, e.g., Inter Ins. Exchange of the Chicago Motor Club v. Wagstaff*, 144 Ohio St. 457, 460 (1945) (holding that an assignee of a claim "stands in the shoes of the assignor . . . and succeeds to all the rights and remedies of the latter."); *N. Chicago Rolling-Mill Co. v. St. Louis Ore & Steel Co.*, 152 U.S. 596, 620 (1894) (holding the same).

[4]*Adcor Opp. Br.* at 2 ("The evidence in this case is that the senior managers at CCS, Crown Simplimatic, Inc. . . . and Adcor had no direct or circumstantial knowledge of any misappropriation of Crown drawings by Bevcorp, at least until Adcor discovered Bevcorp's possession of CSI drawings in 2003.").

[5]*Id.* ("It was not until thousands of Crown drawings were discovered last week in a Brau storage facility that the Connellys' and Bevcorp's access to crown drawings was ascertained.") Adcor's argument in this regard is inconsistent with its allegations in the complaint.  *See Compl.* ¶ 30 ("The first indication to Adcor that Bevcorp possessed its trade secret and confidential engineering drawings was the launch of Bevcorp's line of new fillers, which Adcor believed Bevcorp was incapable of producing given the absence of any engineering employees or necessary facilities at the Ohio Bevcorp facility.")

In Ohio, the discovery rule is an exception to the general rule that a cause of action accrues at the time the wrongful act was committed. *Norgard v. Brush Wellman, Inc.*, 95 Ohio St.3d 165, 167 (2002) (citing *Collins v. Sotka*, 81 Ohio St.3d 506, 507 (1998)).  The discovery rule provides that "a cause of action does not arise until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, that he or she was injured by the wrongful conduct of the defendant." *Norgard*,  95 Ohio St.3d at 167 (citing *Collins*, 82 Ohio St.3d at 507 and *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84 (1983)).  In determining whether a party should have discovered wrongful conduct, "the relevant inquiry is whether the facts known 'would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry." *Marks v. Keybank N.A.*, No. 84691, 2005 WL 433528, at *4 (Ohio App. 8 Dist. Feb. 24, 2005) (citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 181 (1984), in turn quoting *Schofield v. Cleveland Trust Co.*, 149 Ohio St. 133, 142 (1948)).  "If the party has such knowledge and fails to make an inquiry, he is chargeable with knowledge which by ordinary diligence he would have acquired." *Hambleton*, 12 Ohio St.3d at 181.

Although the Court was unable to find any Ohio cases interpreting the discovery rule with respect to statutory misappropriation claims, Ohio's discovery rule is consistent with UTSA cases in other jurisdictions.[6] *See Read & Lundy, Inc. v. Washington Trust Co. of Westerly*, No. PC99-2859, 2002 WL 31867868, at *8 (R.I. Super. Dec. 13, 2002) ("If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been

---

[6]*See* O.R.C. § 1333.68 (directing that the Ohio Act "shall be applied and construed to effectuate their general purpose to make uniform the law with respect to their subject among states enacting them").

-10-

revealed by such an investigation."); *Alamar Biosciences, Inc. v. Difco Lab., Inc.*, Civ-S-941856, 1995 WL 912345, at *3 (E.D. Cal. 1995) ("[W]hen there is reason to suspect that a trade secret has been misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted such an investigation.").  Once a plaintiff learns facts causing the statute of limitations to begin running with respect to one trade secret claim, it begins to run on all trade secret claims as well.  *See, e.g., Intermedics, Inc. v. Ventrites, Inc.*, 822 F.Supp. 634, 657 (N.D. Cal. 1993); *Pilkington Bros., L.P.C. v. Guardian Indus. Corp.*, No. Civ. A. No. 83-5260, 1986 WL 9876, at *6 (E.D. Mich. Jun. 9, 1986).  *See also* UTSA § 6, comment ("This Act rejects a continuing wrong approach to the statute of limitations . . .").

               Adcor also argues that the question of when a statute of limitations accrues is a factual question for a jury to decide, and that courts are hesitant to grant summary judgment based on this ground.  While the Court agrees that the issue of when a statute of limitations accrues may be a question of fact for the jury, it is also clear that, where the relevant facts are undisputed, courts are not hesitant to grant summary judgment as a matter of law.  *See, e.g., Chasteen v. Unisia Jecs Corp.*, 216 F.3d 1212, 1219 (10th Cir. 2000) (affirming summary judgment where undisputed facts showed that the misappropriation claim accrued outside the limitations period); *Precision Airmotive Corp. v. Rivera*, 288 F.Supp.2d 1151, 1153 (W.D. Wash. 2003) (granting summary judgment where undisputed evidence showed that the misappropriation claim accrued outside the limitations period);  *Alamar Biosciences, Inc. v. Washington Trust Co. Of Westerly*, No. PC99-2859, 2002 WL 31867868, at *3 (R.I. Super. Dec. 13, 2002) (holding the same); *Zemcik v. LaPine Truck Sales & Eq. Co.*, 124 Ohio App.3d 581

-11-

(1998) (reversing, entering judgment as a matter of law where undisputed evidence showed that the misappropriation claim accrued outside the limitations period). *See also Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 914 (19th Cir. 2005) (the date a statute of limitations accrues is a question of law when the material facts are undisputed); *Spetsios v. Copperweld Steel Co.*, No. C88-1094, 1988 WL 163066 (N.D. Ohio Sep. 21, 1988) (holding the same).

  In sum, because Adcor filed this case on September 9, 2003, the relevant question is whether, prior to September 9, 1999, the Crown entities (Adcor's predecessors in interest) discovered or by the exercise of reasonable diligence should have discovered that the Connelly Defendants misappropriated their trade secrets. Based on the relevant undisputed evidence articulated in detail below, the Court concludes that the Crown entities had sufficient reason prior to September 9, 1999 to suspect that the Connelly Defendants had misappropriated their trade secrets (i.e., Crown drawings). They chose not to investigate the situation to confirm those suspicions and, in fact, decided not to sue them for economic reasons.

## C. Relevant Undisputed Facts

  In 1988, the Brau Defendants were convicted of misappropriating Crown drawings from Crown employees between 1964 and 1987. They paid over $ 2 million to Crown and entered into a Consent Decree which permitted them to remain in the business of repairing and reconditioning fillers (including Crown fillers) – but prohibited them from manufacturing any Crown parts, obtaining Crown parts other than from Crown, or using in any manner whatsoever any of the knowledge obtained from the misappropriated drawings in connection with their business. The Consent Decree required the Brau Defendants to return to Crown all the misappropriated drawings and other trade secret information. The parties agreed that the

-12-

Consent Decree would apply not only to the Brau Defendants but to their "successors, assigns, agents, representatives and any persons acting directly or indirectly through them or in concert with them."  Douglas Goodell, then-Vice President of Crown's Machinery Division who was "intimately involved" in the drafting and enforcement of the Consent Decree, believed that the Consent Decree applied to Brau's former employees.[7]

The Connellys are former Brau employees.  In 1992, the Connellys left Brau to devote full time to their start-up company, Bevcorp Industries.  Bevcorp openly advertised that it was in the business of selling Crown parts and refurbishing Crown fillers – touting Bevcorp's ability to make new Crown parts.[8]

Between 1994 and September 1999, numerous Crown employees knew that Michael Connelly was a former Brau employee, and suspected that he had misappropriated Crown drawings and was using them in his businesses to manufacture and sell Crown replacement parts.  Specifically:

    (a)    Terry Gordon, a Crown Precision Technology ("CPT") service manager who met Michael Connelly in 1994 when they worked on Crown beverage fillers in Florida, testified that, at that time:

        (1)    he was aware of the fact that a Crown employee had previously sold Crown drawings to Brau so that Brau could make Crown parts, and that Crown had sued Brau over it;[9]

        (2)    he knew that Brau was no longer permitted to manufacture any Crown parts;[10]

---

[7] *ECF No. 42, Ex. 10* ("Goodell Aff.") ¶ 3; *ECF No. 118, Ex. 4* ("Goodell CSI Dep.") at 56.

[8] *See, e.g., ECF No. 118, Trial Br., Exs. 2-6.*

[9] *ECF No. 123* ("Gordon Dep.") at 18-19; *Init'l Contempt Hr'g Tr.* at 101.

[10] *Id.*

-13-

(3)     he knew that Michael Connelly was a former Brau employee who started Bevcorp Industries, and that Bevcorp manufactured Crown parts in competition with Crown;[11]

(4)     he had reason to believe that Michael Connelly and/or Bevcorp had somehow acquired Crown drawings from Brau,[12] based on information generally rumored at Crown,[13] and based specifically on conversations he had with CPT General Manager Charlie Vestal and Crown rebuild shop supervisor Gary Kohler;[14] and

(5)     he voiced concerns about Michael Connelly possibly having Crown drawings to Charlie Vestal after the 1994 Florida trip, and Vestal said he would "check into it."[15]

(b)     Chuck Darby, who was employed by Crown as a consultant in the Machinery Division from 1994 to 1997 and thereafter became Crown Simplimatic's Director of Operations until 2000, corroborated Terry Gordon's testimony.  He avers that:[16]

(1)     while he was employed by Crown in the mid-1990s, he learned that the Connellys "had left Brau Manufacturing and started their own business called Bevcorp, which sold replacement parts for Crown fillers;"[17]

---

[11]*Id*. at 36-38, 64-65.  *See generally Init'l Contempt Hr'g Tr*. at  98-101.

[12]*Id*.

[13]*Id*. at 20, 38.  *See generally Init'l Contempt Hr'g Tr*. at  98-101.

[14]*Gordon Dep*. at 36-38, 59-60, 69 (Vestal told Gordon "[t]hat he thought that Mike had prints left over from the Brau raid."), 70 (Kohler told Gordon "[t]hat Mike was making parts for Crown equipment and that it was assumed that the only way he could do it was to make – to have prints.") (emphasis added).

[15]*Gordon Dep*. at 56-57; *Init'l Contempt Hr'g Tr*. at  99.

[16]On September 28, 2005, more than three months after summary judgment briefing concluded, Adcor filed a document entitled "Supplemental Affidavit of Charles Darby Submitted by Adcor Industries in Opposition to Bevcorp and the Connelly Defendants' Motion for Summary Judgment on Count I."  *ECF No. 177*.  According to Adcor, this second affidavit is "new and more probative" than Mr. Darby's first affidavit, filed by the Connelly Defendants on June 27, 2005.  *ECF No. 156, Ex. 1*.  This untimely attempt to create an issue of fact is simply inappropriate.  *See Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488, 494 (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)).

[17]*ECF No. 156, Ex. A* ("Darby Aff.") ¶ 3.

-14-

(2)    many people at Crown knew that Michael Connelly had left Brau, started Bevcorp and manufactured and sold Crown filler replacement parts;[18]

(3)    some people at Crown suspected that Michael Connelly had taken Crown drawings from Brau when he left and was using them to make Crown replacement parts in his new business;[19]

(4)    notwithstanding this information, in July 1998, he and Harry Tatum visited Bevcorp's facility on behalf of Crown Simplimatic to explore the possibility of acquiring Bevcorp;[20]

(5)    Crown Simplimatic considered acquiring Bevcorp because, among other things, Bevcorp was a competitor of Crown Simplimatic in the manufacture of Crown replacement parts; Michael Connelly had as much knowledge of the Crown fillers as anyone at Simplimatic; the Connellys had an excellent reputation in the beverage industry; and Bevcorp had a very good service and rebuild operation for Crown fillers;[21] and

(6)    although Crown and later Crown Simplimatic knew that Bevcorp was manufacturing Crown parts, and that Michael Connelly had worked at Brau, "neither company sued Bevcorp because Bevcorp's operations were not causing sufficient economic harm to Crown or Crown Simplimatic to justify the cost of litigation."[22]

(c)    Robert Reiss, a former Crown employee (since 1973) who left Crown Simplimatic in 1998 to become Adcor's Director of Beverage Operations, testified that, while at Crown Simplimatic, he knew of two competitors that were making replacement parts for Crown fillers, one of which was Bevcorp.[23]  Reiss testified in November 2003 that he believed the competitors making Crown

---

[18] *Darby Aff.* ¶ 4.

[19] *Id.*

[20] *Id.* ¶ 5.

[21] *Id.* ¶ 8.

[22] *Darby Aff.* ¶ 10.  Darby also averred that "CC&S and Crown Simplimatic did not believe that Bevcorp was violating their patents."  *Id.*  This averment is irrelevant because Adcor is not suing the Defendants for patent infringement, and Adcor has alleged that most of the misappropriated drawings are not protected by patents.

[23] *See ECF No. 129* ("Reiss Dep.") at 7-8, 95, 108-09.

replacement parts had Crown drawings.[24]

> (d)     Crown Vice President and Managing Director of Crown Simplimatic, Douglas Goodell, who was involved in the Brau investigation and settlement, testified in March 1999 that he believed the Consent Decree's prohibitions applied to former Brau employees.[25] He corroborated Darby's testimony that Crown contemplated suing Bevcorp among other strategies, but decided not to.[26]

Based on this undisputed evidence,[27] the Court finds that, beginning in the mid-1990s, Crown and later Crown Simplimatic had actual knowledge of facts that would lead fair and prudent men, using ordinary care and thoughtfulness, to make further inquiry into the affairs of the Connellys. *Marks*, 2005 WL 433528, at *4; *Hambleton*, 12 Ohio St.3d at 181; *Schofield*, 149 Ohio St. at 142. The Court also finds that, although the Consent Decree gave Crown the broad powers to police the activities of Brau and its former employees, Crown chose not to exercise that power, chose not to sue the Connelly Defendants, and decided that acquiring Bevcorp would be the better strategy. *See, e.g., Pilkington Bros.*, 1986 WL 9876 (contemplation of litigation against defendant shows plaintiff actually believed trade secrets were misappropriated). These decisions were based on economic factors.

---

[24]*ECF No. 142, Ex. 9* ("Reiss CSI Dep.") at 189-90. The Court disregards Mr. Reiss's current sworn testimony to the extent that it directly conflicts with his previous sworn testimony and appears to be self-serving. *Compare Reiss Dep.* at 151-52 (taken April 21, 2005) *with Reiss CSI Dep.* at 189-90 (taken on November 19, 2003). *Lindstrom*, 424 F.3d 488, 494 (citing *Biechele*, 747 F.2d at 215).

[25]*Goodell CSI Dep.* at 56. The Court disregards Mr. Goodell's recently filed affidavit to the extent that it directly conflicts with his previous sworn testimony and appears to be self-serving. *Compare id.* (taken on March 10, 1999) *with Goodell Aff.* ¶ 3 (dated May 3, 2005). *Lindstrom*, 424 F.3d 488, 494 (citing *Biechele*, 747 F.2d at 215).

[26]*Id.* at 55-57, 61-62. *See supra* n. 8.

[27]To the extent that a reviewing court may disagree with this Court's findings with respect to Reiss (section (c) above) and Goodell (section (d) above), the undersigned also finds that the undisputed evidence with respect to Gordon and Darby is sufficient to support my conclusion that the statute of limitations accrued as early as 1994 and no later than 1998.

Had the Crown entities investigated the Connelly Defendants in a timely manner, they would have learned what has been discovered in this case, i.e., that the Brau Defendants never returned all the Crown drawings in their possession;  that the Brau Defendants continued to manufacture and sell Crown replacement parts after the Consent Decree was entered;  that, at the very least, Michael Connelly used his knowledge of Crown dimensions and tolerances in the design and manufacture of those parts while he was still employed by Brau;  and that Michael Connelly continued to manufacture and sell those parts in his subsequent businesses.  Thus, the Crown entities (and now Adcor) are charged with this knowledge, which by ordinary diligence they would have acquired had they investigated the Connelly Defendants in a prompt manner. *Hambleton*, 12 Ohio St.3d at 181; *Read & Lundy, Inc.*, 2002 WL 31867868, at *8.  This knowledge, acquired between 1994 and 1998, commenced the running of the four-year limitations period, which expired well before September 9, 2003.  *Alamar Biosciences, Inc.*, 1995 WL 912345, at *3.

Adcor argues that its misappropriation claim did not accrue until February 2003 because prior to that time, "[t]here was no reason to suspect that Bevcorp possessed thousands of Crown drawings as a result of its connection to Brau."  *Adcor Opp. Br.* at 2.  Furthermore,

> [t]he evidence in this case is that the senior managers at [Crown, Crown Simplimatic] and Adcor had no direct or circumstantial knowledge of any misappropriation of Crown drawings by Bevcorp, at least until Adcor discovered Bevcorp's possession of [Crown Simplimatic] drawings in 2003.  The evidence will show that Bevcorp was not considered a significant competitor, and certainly there was never any suspicion that Bevcorp might possess every Crown drawing for every Crown filling machine. Indeed, the evidence will show that there are numerous genuine disputes of material fact, including Bevcorp's and the Connellys' assertion that no Crown drawings were misappropriated.  Under such circumstances, the accrual of any statute of limitations is

-17-

properly left for the finder of fact.

*Id*.  This argument is meritless.  It was not necessary for the Crown entities to suspect that

Bevcorp possessed "thousands of drawings" or "every Crown drawing for every Crown filling

machine" or to wait until  Bevcorp became "a significant competitor" in the beverage filler

industry in order for the misappropriation claim to accrue.  The only question is whether the

facts

known would lead a fair and prudent man, using ordinary care and thoughtfulness, to make

further inquiry.  *Marks*, 2005 WL 433528, at *4.

In support of its contention that there was no reason to suspect that any Crown

drawings were available to the Connellys until February 2003, Adcor cites the testimony of

Douglas Goodell, Robert Reiss, James Parker (former President of Crown Simplimatic), and

Jimmy Stavrakis (Owner and President of Adcor) who have attested that (1) they had no actual

knowledge that Bevcorp possessed any Crown drawings and (2) there was no reason to suspect

that Bevcorp obtained Crown drawings after they were purportedly returned to Crown by the

Brau Defendants in 1988.  *See Adcor Opp. Br*. at 11-16.  However, the relevant question is

whether, prior to September 1999, Crown had reason to suspect that the Connelly Defendants

misappropriated its trade secrets – <u>not</u> whether anyone at Crown or Jimmy Stavrakis had actual

knowledge that Bevcorp possessed Crown drawings.  Additionally, Mr. Goodell's averments

related to "Bevcorp, LLC" which did not exist until 2002; Parker never worked at Crown and did

not join Crown Simplimatic until May 1997; and, in any event, the knowledge and suspicions of

Chuck Darby, Terry Gordon, Charlie Vestal, and Gary Kohler obtained within the scope of their

-18-

employment are imputed to Crown, even if other Crown employees did not share those beliefs.[28]

Adcor also contends that "mere knowledge that a company is competing in the marketplace and manufacturing similar parts is not dispositive on the accrual of the statute of limitations in a trade secret misappropriation case."[29]  While this proposition may be true, it does not fit the facts of this case.  The Brau Defendants were convicted felons who misappropriated Crown's trade secrets.  In an effort to prevent further use of its trade secrets, Crown obtained a court order prohibiting the Brau Defendants from making Crown parts or using knowledge obtained from the purloined drawings to make such parts.  The Consent Decree gave Crown broad powers to police its compliance.  Crown believed the Consent Decree's prohibitions applied to Brau's former employees, and the Decree gave Crown the right to interview former Brau employees regarding any future business activity.  The Connellys are former Brau employees who started a business making and selling Crown replacement parts in direct

_____

[28]*See, e.g.,* 39 O.Jur.3d § 402 (2002), *Knowledge of Employee as Chargeable to Employer*; *DiPietro v. Lighthouse Ministries*, 159 Ohio App.3d 766, 773 ( 2005) (employee's knowledge is imputed to his employer only if it is obtained within the scope of his employment) (citing *Hallowell v. Athens*, Athens App. No. 03CA29, 2004-Ohio-4257, 2004 WL 1802042, at ¶ 11, in turn citing *Amer. Fin. Corp. v. Fireman's Fund Ins. Co.*, 15 Ohio St.2d 171, 174 (1968)).

[29]*Adcor Opp. Br.* at 25.  In support of this position, Adcor cites *Envirotech Corp. v. Callahan*, 872 P.2d 487 (Utah 1994) which, Adcor claims, is "especially analogous to this case." *Id*. at 26.  *Envirotech* is factually and legally distinguishable.  First, Envirotech sued its former employees for misappropriating its confidential drawings.  There was no reason for Envirotech to suspect that its former employees, who had previously signed confidentiality agreements, had taken its drawings and were using them until they began taking orders for parts that could only have been produced using Envirotech's drawings.  Here, there was every reason to suspect that the Connellys took Crown or Brau drawings from Brau and used them in their new business.  Second, the *Envirotech* defendants admitted taking the drawings but argued that the misappropriation claim accrued at the moment they took those drawings.  No defendant is admitting liability or making that argument here.  Third, the Utah Supreme Court in *Envirotech* interpreted Utah state law providing that the limitations statute is tolled "where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct."  *Id*. at 492-93.  That law is obviously different than the discovery rule being interpreted by this Court.

competition with Crown, and they made no bones about it.  Numerous Crown employees suspected that Michael Connelly had taken Crown drawings and used them in his business, and Crown Simplimatic's Director of Operations was aware of this.  In short, Crown possessed significantly more than 'mere knowledge' that 'a company' was competing with it in the marketplace.

Adcor argues that there was no reason to suspect that the Connelly Defendants had Crown drawings because they deliberately concealed any connection between their jobs at Brau and at Bevcorp.  *Adcor Opp. Br.* at 9-10.  There is no evidence that the Connellys deliberately concealed any connection between their employment at Brau and the companies they later formed, and the evidence shows that the Connelly Defendants openly and aggressively advertised that they were in the business of manufacturing and selling Crown replacement parts during the 1990s.

Adcor also argues that there was no reason to suspect that the Connelly Defendants possessed Crown drawings because the initial discovery in this case appeared to confirm that the Brau Defendants returned all the drawings to Crown.  In support of this position, Adcor claims that Haag and Romp testified untruthfully that they had returned all the drawings, and Victoria Connelly gave misleading and untruthful testimony regarding her knowledge of Crown drawings and her role at Brau.  The alleged untruthfulness of any of the Defendants' testimony in this case is not relevant to the issue of when Adcor's misappropriation claim accrued.  *See, e.g., Pilkington Bros, PLC v. Guardian Indus. Corp*., 1986 WL 9876, at *3 ("If the statute [of limitations] is tolled so long as defendant denies the use of plaintiff's trade secrets, the statute would never begin to run.").

-20-

On a different note, there is undisputed evidence that <u>Adcor</u> knew of the Connelly Defendants' alleged unlawful activities prior to September 9, 1999.  In early 1999, Robert Reiss, a former Crown employee who became Adcor's Director of Beverage Division in 1998, had a conversation with Michael Connelly who told him that Bevcorp could make nearly any Crown part.  Mr. Reiss, who testified that he was surprised when he heard this, suspected that Bevcorp might have Crown drawings.  Nevertheless, in February and May 1999, he ordered hundreds of Crown parts (which Adcor did not have the equipment to make) from Bevcorp, and then resold those parts to Adcor's customers at a profit.  The parts included gears and other high-wear parts which, Reiss later testified, contained critical dimensions and/or tolerances.

Because Adcor did not acquire certain of the Crown entities' assets until December 2000, it had no basis upon which to act regarding this information until it acquired those assets.  However, there is no unfairness in applying the four-year statute of limitations to Adcor.  Reiss brought the knowledge about the Connelly Defendants, which he gained from working at Crown, with him to Adcor in 1998.  Assuming the statute of limitations started to run in 1998, around the time Reiss joined Adcor, Adcor still had approximately two years left after acquiring the Crown assets in December 2000 to file a timely misappropriation claim against the Connelly Defendants.  The knowledge imputed to Reiss at the time he left Crown was only strengthened in February and May 1999 when Michael Connelly told Reiss that he could make any Crown part and Reiss thought he might have Crown drawings.  Adcor had plenty of time to file a misappropriation claim, but elected not to do so.

Accordingly, based on the relevant undisputed evidence, the Court concludes that Adcor's misappropriation claim accrued as early as 1994 (when Terry Gordon informed his boss

-21-

that Michael Connelly might have Crown drawings) and no later than 1998 (when Crown chose not to sue the Connelly Defendants).  In either event, the claim accrued months, if not years, prior to September 9, 1999.  Because Adcor filed the misappropriation after the four-year statute of limitations expired, the Court must **GRANT** summary judgment in favor of the Connelly Defendants and against Adcor on Count I .

### D.    Haag and Romp

A review of the record shows that Defendants Haag and Romp did not file a summary judgment motion as to Count I, and did not join in the summary judgment motion filed by the Connelly Defendants.  Nevertheless, the Court dismisses the trade secret claim against them for the following reasons.

Because Adcor filed this case on September 9, 2003, the relevant question is whether, prior to September 9, 1999, Crown discovered or by the exercise of reasonable diligence should have discovered that Haag and Romp misappropriated its trade secrets.  The Court has now found that Adcor's predecessor, Crown, was in possession of facts in the mid-1990s that would lead a reasonable person to make further inquiry into whether the Connellys misappropriated Crown drawings from Haag and Romp or from Brau.  This is the basis for the Court's conclusion that Adcor's misappropriation claim against the Connelly Defendants accrued before September 9, 1999.  Adcor alleges that Haag and Romp assisted the Connellys in misappropriating Crown's drawings.  To the extent that Crown was in possession of facts in the mid-1990s requiring Crown to make further inquiry as to the Connellys' conduct, those suspicions necessarily ran to Haag and Romp at that time as well.  Thus, the Court finds that the trade secret misappropriation claim against Haag and Romp also accrued before September 9,

1999.

In addition, Haag and Romp ceased business operations in late 1999 and sold their building and equipment to the Connellys in March 2000.  Although evidence establishes that Haag and Romp violated the Consent Decree by failing to return all the Crown and derivative drawings in their possession – a matter which will be addressed in Section III(B) – there is absolutely no evidence that they used those drawings to manufacture Crown parts in the six months between the date the trade secret statute of limitations began to run (September 9, 1999) and the date Haag and Romp sold their building and equipment to the Connellys (March 2000).  In fact, the evidence shows that in its final years, only two employees other than Haag and Romp remained at Brau and Brau was doing mostly job shopping.

Accordingly, the misappropriation claim against Haag and Romp in Count I is also **DISMISSED WITH PREJUDICE**.

### III.    COUNTS IV and V  –  Contempt Claims

#### A.    Standard of Review

The purpose of a contempt proceeding is to "enforce the message that court orders and judgments are to be taken seriously."  *Electrical Workers Pension Trust Fund v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 385 (6th Cir. 2003) (citing *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987)).

> When a court seeks to enforce its order or supervise its judgment, one weapon in its arsenal is contempt of court.  *See NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir.1987).  Recognizing that the power "to punish for contempts" should not be used lightly, the Supreme Court has stated that this power "is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees

> would be only advisory." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418,
> 450, . . . (1911).  Contempt proceedings enforce the message that court orders
> and judgments are to be complied with in a prompt manner.  *Cincinnati Bronze*,
> 829 F.2d at 590.

*Id*. at 378-79 (parallel citation omitted).  The decision whether to hold a person in contempt is within the trial court's sound discretion.  *Id*. at 378 (citing *Peppers v. Barry*, 873 F.2d 967, 968 (6th Cir. 1989)).  The court's discretion "includes the power to frame a sanction to fit the violation."  *Id*. at 385 (quoting 11A Charles Alan Wright, et al., *Federal Practice and Procedure* section 2960, at 372-73 (2d ed. 1995)).  "With respect to civil contempt proceedings, '[j]udicial sanctions . . . may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.' "  *Id.* at 379 (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)).

A complaining party in a civil contempt case must prove by clear and convincing evidence that the alleged contemnor violated "a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts *with knowledge of the court's order*."  *N.L.R.B. v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 590 (6th Cir.1987) (citations omitted and emphasis added).  Interpretation of a consent decree is a question of law.  *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 ( (citing *Huguley v. Gen. Motors Corp.*, 67 F.3d 129, 132 (6th Cir.1995)).

Federal Rule of Civil Procedure 65(d) limits those persons who can be bound by a federal injunction.  Rule 65(d) provides in pertinent part as follows:

> Every order granting an injunction and every restraining
> order . . . is binding only upon the parties to the action, their

-24-

>officers, agents, servants, employees, and attorneys, and upon
>those persons in active concert or participation with them who
>receive actual notice of the order by personal service or otherwise.

*Id.*

A non-party with notice of a court injunction can only be held in contempt if

shown to be in concert or participation with the enjoined party.[30]  *See Zenith Radio Corp. v.*

*Hazeltine Research*, *Inc.,* 395 U.S. 100, 112 (1969); *In re NAACP, Special Contribution Fund,*

Nos. 87-3366, 87-3673, 1988 WL 61504, at *5 (6th Cir. June 13, 1988); *Microsystems Software,*

*Inc. v. Scandinavia Online AB,* 226 F.3d 35, 43 (1st Cir. 2000).  The non-party must be deemed

to have aided and abetted the enjoined party in the prohibited conduct, or must be "legally

identified" with the enjoined party.  *Microsystems Software, Inc.,* 226 F.3d at 43.

In order to show that a non-party "aided and abetted" a party subject to the

decree, the plaintiff must show that the non-party had actual knowledge of the judicial decree

and violated it, and that the challenged action was taken for the benefit of, or to assist, a party

subject to the decree.  *Id.  Additive Controls & Measurement Sys., Inc. V. Flowdata Inc.,* 154

F.3d 1345, 1353 (Fed. Cir. 1998) ("Non-parties are subject to contempt sanctions if they act with

an enjoined party to bring about a result forbidden by the injunction, but only if they are aware

of the injunction and know that their acts violate the injunction . . . .") (internal citations omitted).

Persons can be "legally identified" with a party as successor or assigns.  *G. & C.*

*Merriam Co. v. Webster Dictionary Co., Inc.,* 639 F.2d 29, 36 (1st Cir. 1980).  In order to be

---

[30]The Sixth Circuit has provided little guidance regarding non-party liability under Rule 65(d).  Accordingly, this Court will review the published precedent of other Circuits that have considered this issue.

subject to contempt proceedings as successor, the successor must be one who has received a

transfer of the business or some part of it from the enjoined party.  *Id.; Saga Int'l, Inc. v. Brush*

*and Co., Inc.,* 984 F.Supp. 1283, 1288 (C.D. Cal. 1997) (the fact alone that a non-party

continued working in the same line of business was inadequate to render his new corporation a

successor in interest).  A non-party can also be "legally identified" with an enjoined party if both

parties are in privity with each other.  *Saga Int'l, Inc.,* 984 F.Supp. at 1286.  *See also Vulcan,*

*Inc. v Fordees Corp.,* 450 F.Supp. 36, 41-42 (N.D. Ohio 1978).

> Generally speaking, privity exists when a third party's interests are so intertwined with a named party's interests that it is fair under the circumstances to hold the third party bound by the judgment against the named party.  Privity can arise if a third party had control over the litigation conducted by the named party, if his interests were adequately represented by the named party, or if some other implied or in-fact representation or alignment of interests existed between the parties . . . . The relevant inquiry is whether the person sought to be bound was directly involved in shaping the outcome of the prior litigation such that his interests were adequately represented."  *Id*. at 1287 (internal citations omitted).

*Saga Int'l. Inc.,* 984 F.Supp. at 1287 (internal citations omitted).  *See also Vulcan, Inc. v.*

*Fordees Corp.,* 658 F.2d 1106, 1109 (6th Cir. 1981).

Consent decrees are subject to equitable defenses.  *Brennan v. Nassau County*,

352 F.3d 60, 63 (2d Cir. 2003); *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999).

"The doctrine of laches is an equitable principle that bars recovery in circumstances in which a

plaintiff's delay in seeking a judicial remedy prejudices a defendant."  *Bylinski v. City of Allen*

*Park*, 169 F.3d 1001, 1003 (6th Cir. 1999).  "A party may not, by silence, create an impression

of acquiescence that leads others to make substantial commitments."  *Hadix v. Johnson*, Nos. 93-

1551, 93-1555, 93-1559, 93-1560, 93-1642, 93-1643, 1995 WL 559372, at *2 (6th Cir. Sept. 20, 1995) (citation omitted).  A mere lapse of time does not constitute laches; rather, to prevail on this defense, the defendants must show that the plaintiff unreasonably delayed in bringing suit and that the defendants were prejudiced by this delay.  *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164, 1182 (6th Cir. 1972); *Gardner v. Panama R. Co.*, 342 U.S. 29, 31 (1951); *Wells v. United States Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1250 (6th Cir. 1991).  Application of a laches defense is left to the sound discretion of the court.  *Hadix,* 1995 WL 559372, at *2.

### B.    COUNT IV – Haag and Romp

Clear and convincing evidence establishes that Defendants Haag and Romp, parties to the Consent Decree, began violating both the letter and the spirit of the Decree almost immediately after it was issued in 1988, and that their violations have continued to the present day.  As previously discussed, the Consent Decree details the fraudulent and criminal conduct of Haag and Romp spanning more than twenty years.  In addition to entering the Consent Decree, both men pled guilty to felonies.

The Consent Decree permitted the Brau Defendants to continue in the business of repairing and reconditioning beverage fillers including Crown fillers.  However, the Decree prohibited them from manufacturing (or obtaining other than from Crown) Crown parts for this purpose, and it prohibited them from using in any manner whatsoever any proprietary information or knowledge obtained from Crown.  *Consent Decree* ¶¶ 8, 10.  The Decree required them to inform their employees, customers, the trade and the public, by written letter and/or advertising, in language satisfactory to Crown, that they have forever withdrawn from the

business of manufacturing Crown parts and that, to the extent such parts would be required in their repair or reconditioning work, they would use only genuine Crown parts purchased directly from Crown.  *Id*. ¶ 11(d).

Far from abiding by the Decree themselves and ensuring that their employees did as well, the evidence shows that Haag and Romp began to cut corners immediately.  *See Supp'l Contempt Hr'g Tr*. at 27-28 (referring to my conclusions in *Init'l Contempt Hr'g Tr*. at 20-21, 29-32).  Although the Consent Decree required Haag and Romp to inform their employees in writing that they had forever withdrawn from the business of manufacturing Crown parts, and that to the extent such parts would be required in their repair or reconditioning business they would use only genuine Crown parts purchased directly from Crown, the evidence shows that they held a single meeting at which they informed their employees orally of the prohibition against manufacturing new Crown parts.  *See, e.g., ECF No. 122* ("Haag Dep.") at 25-27; *Init'l Contempt Hr'g Tr*. at 39-40 (M. Connelly), 111-12 (V. Connelly); *ECF No. 124* ("Moore Dep."), at 67.  Although Romp testified that he posted a copy of the Consent Decree on the company bulletin board, the Connellys don't remember seeing it there.

Clear and convincing evidence also shows that, shortly after the Decree was entered, the Brau Defendants had their employees re-manufacture used Crown parts from memory, *Haag Dep*. at 35-37; *Moore Dep*. at 69, and create "rework" drawings which were used to rebuild used Crown parts, *Init'l Contempt Hr'g Tr*. at 20-21 (Romp), 40-43 (M. Connelly); *ECF No. 127* ("M. Connelly Dep.") at 40-42.  The key to the parts were the dimensions and tolerances.  Often, the dimensions could be determined by reverse engineering or measuring the part.  *M. Connelly Dep*. at 40-42.  However, employees also input tolerances and dimensions

from memory.  *Id.*; *Init'l Contempt Hr'g Tr.* at 20-21 (Romp), 40-43 (M. Connelly).  There is undisputed evidence that Haag and Romp stored a significant number of used Crown fillers, which they cannibalized for parts to refurbish and sell, at an offsite facility.  *Haag Dep.* at 66-68; *Romp Dep.* at 43-45; *Moore Dep.* at 69-71.  Romp testified that it was his understanding that they were permitted to refurbish (or re-manufacture) Crown parts.  *See Supp'l Contempt Hr'g Tr.* at 29-32 (Romp).  The Consent Decree made clear, however, that "to the extent such parts would be required in their repair or reconditioning work, they would use only genuine Crown parts purchased directly from Crown."  *Consent Decree* ¶ 11(b).  This unambiguous provision brooks no interpretation.

The Consent Decree also required Haag and Romp to return to Crown, within 10 days of the Decree's issuance, all Crown drawings, inventory and other proprietary materials in their possession.  *Consent Decree* ¶ 10.  The Decree forever barred them from possessing, reproducing or replicating any documents referring, relating or pertaining to the manufacture of Crown parts, and required them to immediately turn over to Crown any such documents coming into their possession in the future.  *Id.* ¶ 12.

In late May 2005, nearly four weeks after the initial contempt hearing, Adcor discovered in an unlocked safe in the storage facility presently rented by Haag and Romp approximately 1,100 drawings of Crown parts.  The drawings variously contain Crown legends, Brau legends, and a few notched-out legends.[31]  *See Supp'l Contempt Hr'g Tr.* at 5.  The most recent rental check for the storage facility was signed by Chester Romp and dated May 5, 2005 –

---

[31]The drawings that were recovered from the Brau storage facility on the first day of Adcor's search are located at *Supp'l Contempt Hr'g Tr.*, *Ex. 3*.

nine days after the initial contempt hearing and three weeks prior to the discovery of the 1,100

drawings.[32]  This recent discovery necessitated the emergency supplemental contempt hearing on

June 22, 2005.  Romp testified at the supplemental hearing that he recognized the safe as the one

that was located in the shop at Brau and was moved to the Willoughby storage facility in 2000

by the Connellys:

> Q.      And you were actually inside the area which is the rental space that you have there, right?  You were sitting in there.
>
> A.      Yes.
>
> Q.      And in the center of the room, for lack of a better way of putting it, was a large black safe.  Is that right?  Do you remember seeing the safe?
>
> A.      I remember I saw it after I got there.
>
> Q.      Yes. And then you saw me –
>
> A.      I did.
>
> Q.      – and Mr. Stavrakis move the pile of steel in front of the safe and open it up?
>
> A.      Uh-huh.
>
> Q.      Do you recall that, sir?
>
> A.      Yes.
>
> Q.      Do you recall us pulling out the drawers and saying, "Look, there are Crown Cork & Seal drawings in this safe"?
>
> A.      Yes, I do.
>
> Q.      And you never – you recognized that safe as being the safe from your prior business over in Willoughby, right?  That's your safe.
>
> A.      I recognized it as being our safe.
>
> Q.      Okay.  Where was that safe located when you were in business back in the Brau days, in the building that the Connellys now occupy?  Where was it, in the office?
>
> A.      I think it was in the shop.
>
> Q.      In the shop?  Okay.  And that safe had drawers in it, did it not?

_____

[32]The check made out to the storage facility by Romp is located at *Supp'l Contempt Hr'g., Ex. 4.*

A.    Drawers?

Q.    Yes.

A.    Yes.

Q.    And those drawers were suitable for putting prints in the drawers, correct?

A.    Oh, yes.

*        *        *

Q.    Okay.  And so when the safe was moved it was in all likelihood, to the best of your recollection, moved in 2000.  Is that right?

A.    Yes.

*Supp'l Contempt Hr'g Tr.* at 33-35.  *See also id.* at 53-54 (M. Connelly).  Based on this undisputed evidence, the Court concludes that Haag and Romp violated paragraphs 10 and 12 of the Consent Decree.

Counsel for Haag and Romp contends that the testimony of his clients has been consistent and truthful, to the extent that they can or cannot recall what happened in the past, while simultaneously explaining that his clients are elderly persons with mental infirmities, suggesting a basis for their lack of recall (and, presumably, their inconsistencies and unreliability).  *ECF No. 144* at 1; *ECF No. 162* at 1.  There is only one conclusion that can be drawn from their testimony and the evidence:  they testified falsely about having returned all the drawings to Crown,[33] they violated the Consent Decree by selling Crown parts which they rebuilt from memory and from rework drawings generated, in part, from their employees' memories, and their purported lack of knowledge regarding what happened to all their post-Consent Decree

---

[33]*See Haag Dep.* at 111-12, 115-17, 122, 137, 143; *ECF No. 125* ("Romp Dep."). at 78-80, 82*; Init'l Contempt Hr'g Tr.* at 18, 30-31, 42, 88 (Romp); *Supp'l Contempt Hr'g Tr.* at 25-31 (Romp).

-31-

business records cannot be trusted.[34]

Haag and Romp admit that they "may not have followed the 1988 Judge Krenzler decree in its entirety, i.e., there is some evidence that use of prior improperly acquired knowledge was used by employees in refurbishing Crown parts." *ECF No. 133*, at 2.  They regard this as a trifling matter since "it is quite obvious from all the depositions and evidence that no one thought they were doing anything wrong." *Id*.  The Court disagrees.  It is irrelevant whether they thought they were violating the Consent Decree and, regardless, their testimony lacks credibility given the unambiguous provision requiring them to purchase directly from Crown any parts they used to refurbish Crown fillers.

Haag and Romp seek to absolve themselves of liability for failing to return the drawings recently found in their storage facility by arguing that there is no evidence that they personally and knowingly retained those drawings.  They maintain that they "did everything they were required to do by the Consent Decree." *ECF No. 162* at 4.  They actually assert that:

> [i]n spite of their and Crown's best efforts, Crown materials mistakenly found
> their way to the Ohio Rubber facility warehouse.  Nothing that Romp or Haag can
> do now will turn back the clock and undo or cure the mistake.  Most importantly,
> there is no evidence that Crown or the plaintiff were harmed in any way by the
> presence of the documents in the warehouse.  No evidence connects Brau, Romp,
> Haag or Bevcorp to the use, in any way, of these documents.

*Id*.  The fact is that Haag and Romp, not Crown, were under court order and were personally responsible for returning all misappropriated and derivative drawings to Crown in 1988.  There is no mistake here.  The presence of the drawings in a safe which they retained in a storage

---

[34]Evidence shows that Haag and Romp impeded discovery by neglecting to look for business records in their storage facility –  even though they were required to produce those records and that was the most likely place to find them.  *See Supp'l Contempt Hr'g Tr*. at 46-48 (Romp).

facility they currently rent leads to but one conclusion – they failed to return the drawings in 1988 as directed by the court, they used those drawings for years at Brau and they kept the drawings in storage when they ceased operations.  The alternative conclusion – the "mistake" theory suggested by counsel – would require this Court to believe that (1) Haag and Romp forgot to look in their office safe in 1988 when they searched for drawings to return to Crown, and (2) over 1,100 Crown drawings sat untouched and unused in that safe for 12 years of business operations, unbeknownst to Haag and Romp, until the safe was moved to the storage facility in 2000 when Brau ceased operations.

The Court will not allow Haag and Romp to avoid liability for their numerous violations of the Consent Decree based upon a lack of evidence showing harm when they purportedly cannot account for the relevant business records.  While it appears that Brau had ceased operations in 1999, and the Crown drawings were in storage at the time Adcor purchased the Crown assets in December 2000, this does not negate a finding of contempt against Haag and Romp.  Although proof of actual damages may be relevant in fashioning a remedy, it is not a prerequisite for a finding of contempt under the Consent Decree.

The Brau Defendants argue that they should be subject to criminal (versus civil) contempt, if anything, because their violations occurred in the past, the damages are punitive in nature and their offenses are against the United States.  *ECF No. 133* at 4; *ECF No. 162* at 4-5. It is noteworthy that criminal contempt has a one-year statute of limitations (whereas there is no statute of limitations for civil contempt), and the maximum fine that can be imposed on each Defendant is $1,000.  18 U.S.C. § 402.

-33-

This case has never been a criminal proceeding. The Court specifically advised the parties and counsel at the April 27th hearing that it was conducting a <u>civil</u> contempt proceeding, asked if that was the parties' understanding, and counsel for Haag and Romp did not object. *See Init'l Contempt Hr'g Tr.* at 4. The Court reminded everyone at the subsequent hearing that it was conducting a civil contempt hearing. *See also Supp'l Contempt Hr'g Tr.* at 18, 21. Again, no objections. The Court issued no notice that Defendants were being tried for criminal contempt as required under Fed. R. Crim. P. 42(a)(1), the Court did not appoint a prosecutor as required under Rule 42(a)(2), and Defendants did not waive their right to a jury trial under Rule 42(a)(3). *United States v. Ayer*, 866 F.2d 571, 573 (2nd Cir. 1989) (explaining the constitutional procedural safeguards for criminal contempt proceedings under Rule 42). Counsel for Haag and Romp is a noted criminal defense attorney in this district who also represented Haag and Romp in the criminal and civil cases brought against them in 1987 by Crown Cork & Seal. His failure to object to the civil nature of the contempt proceeding when the Court gave him the opportunity to do so ends this matter.

The parties to the Consent Decree understood the Decree to constitute "a permanent injunction," the violation of which would be punishable as contempt. *Consent Decree* ¶ 13. The parties agreed that, in the event a Court determined that they violated any provision of the Decree, they would, in addition to other damages, be jointly and severally liable for attorneys' fees and costs incurred in investigating and establishing such violations. *Id.* ¶ 14. Based on all the evidence and the Court's assessment of the credibility or lack thereof of the witnesses, the Court hereby concludes that Defendants Haag and Romp are in contempt of court.

Accordingly, the motion for contempt articulated in Count IV is **GRANTED** with

-34-

respect to Defendants Haag and Romp.  The Court hereby directs Haag and Romp to provide to the Court and opposing counsel, **no later than November 21, 2005**, their personal 2003 and 2004 federal income tax returns and the returns of any corporation(s) they control, as well as their personal net worth statements.  Adcor shall provide to the Court and opposing counsel, **no later than November 30, 2005**, a statement detailing the fees and costs it incurred in investigating and litigating the contempt claims against Defendants Haag and Romp.

### D.    Count IV – Michael and Victoria Connelly

Adcor alleges that the Connelly Defendants violated the Consent Decree by taking Crown or Crown-derivative drawings from the Brau Defendants and using them to manufacture Crown replacement parts in competition with Crown, and now Adcor.  The Connelly Defendants argue that they did not violate the Consent Decree because they had no actual knowledge of it, they are not parties to it and there is no other basis for their being bound by it, and the claim against them is barred by the doctrine of laches.  Adcor contends that the Connelly Defendants knew about the Consent Decree, that they are bound by it based on their status as privies or successors to the Brau Defendants, and that laches does not bar their claim. The Court will address each argument in turn.

First, the Connellys argue that they cannot be found in contempt because they testified that they knew nothing about the Consent Decree until the instant case was filed.[35] They argue that in order to find a person in contempt, the complaining party must establish that the alleged contemnor had "actual knowledge" of the court order violated.  *ECF No. 115*, at 1-2.

---

[35] *See, e.g., M. Connelly Dep.* at 50; *Init'l Contempt Hr'g Tr.* at 112 (V. Connelly).

In support of this position, they cite *Electrical Workers Pension Trust Fund v. Gary's Elec. Serv. Co.*, 340 F.3d 373 (6th Cir. 2003); *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716 (6th Cir. 1996); and *Consolidation Coal Co. v. Local Union No. 1784*, 514 F.2d 763 (6th Cir. 1975)). These cases do not stand for the proposition that a contemnor must have actual knowledge of a court order to violate it.  The Sixth Circuit has found that evidence of knowledge of a court order (or constructive knowledge) is sufficient.  *Polo Fashions, Inc. v. Stock Buyers Int'l, Inc.,* 760 F.2d 698, 700 (6th Cir. 1985).  This holding makes sense, since it would be unreasonable for the Court to be forced to rely on the Connellys' denials that they knew anything about the Consent Decree and its prohibitions in light of overwhelming direct and circumstantial evidence showing that they did.

The Connellys testified that they never saw or read the "Consent Decree," and they knew nothing about it until this case was filed.  While they may not have literally seen or read the Decree, their own testimony shows that they knew about the agreed injunction.  At the initial contempt hearing, Mr. Connelly testified as follows:

> Q.      So you were not curious about the fact that you could no longer manufacture any Crown parts new, and that it would have a direct impact one would presume on your business of rebuilding machines.  You never asked Mr. Haag or Mr. Romp at all about the consent decree?

> A.      We were told that they had a <u>settlement</u>; that they were not allowed to make Crown parts.  That's what I was told and that was sufficient for me.

*Init'l Contempt Hr'g Tr*. at 65 (M. Connelly) (emphasis added).  Mrs. Connelly testified at the same hearing as follows:

> Q.      At some point, were you given any information about restrictions that Brau agreed to as a result of Mr. Haag and Mr. Romp's conduct?

-36-

A.     Yes.  My recollection is there was a company meeting where all the employees were gathered in the cafeteria, and I believe it was Mr. Haag who spoke, and he informed the employees that they had made an <u>agreement</u>, that they would no longer make new parts for Crown fillers but would be allowed to rebuild fillers and equipment and parts, and that they were also going to try to grow the business in other areas and try new ventures.

*Id*. at 112 (V. Connelly) (emphasis added).  Thus, although the Connellys may not have seen or read the Consent Decree, they certainly knew about it and its prohibition against manufacturing Crown parts.

Overwhelming circumstantial evidence shows that they could not possibly have been ignorant of it.  The Connellys admitted that they knew that Haag and Romp bribed Crown employees to obtain Crown drawings, and that they were prosecuted for it.[36]  Michael Connelly was present at Brau the day the FBI came to the facility.[37]  They questioned him about the purloined drawings, removed 40 filing cabinets and, to his knowledge, left no drawings behind.[38]  The FBI also went to the Connellys' home and questioned Mrs. Connelly concerning her knowledge about Baron Haag, Ed Sullivan and the drawings.[39]  After the Consent Decree was issued, Haag and Romp held a meeting attended by the Connellys during which they informed their employees that they had settled their case and that they were prohibited from manufacturing

---

[36]*Init'l Contempt Hr'g Tr*. at 36 (M. Connelly), 59 (M. Connelly), 110 (V. Connelly); *Supp'l Contempt Hr'g Tr*. at 87 (M. Connelly), 91 (V. Connelly).

[37]*M. Connelly Dep*. at 35.

[38]*Id*. at 36-38.

[39]*V. Connelly Dep*. at 19-20.

new Crown parts.[40]  Following the FBI raid and the entry of the Consent Decree, two Crown employees spent 8 weeks at Brau looking for every trace of Crown proprietary material stolen by Haag and Romp, and removed the entire inventory of Crown parts.[41]  Crown later made unannounced visits to the facility to ensure compliance with the Decree.[42]  After the Decree was issued, the only drawings the Brau employees used to re-manufacture Crown parts were rework drawings that the employees generated based on a combination of reverse engineering and recall.[43]  The evidence also shows that, within two to three years of beginning her employment at Brau, Victoria Connelly assumed a lot of administrative responsibilities at Brau.  According to Baron Haag, "[s]he ran the whole show."[44]  According to Chester Romp, she did almost all the paperwork, ordered materials from suppliers, placed and expedited orders, wrote payroll checks and checks to suppliers, handled customers, and basically did "everything that had to be done."[45]

Given the aforementioned facts, Mrs. Connelly's central role at Brau, her husband's 20 years of employment there as lead mechanic, the small size of the company (no more than 25 employees),[46] the fact that the manufacture of Crown parts comprised at least 75%

---

[40]*Id*. at 22; *M. Connelly Dep*. at 39; *Init'l Contempt Hr'g Tr*. at 65 (M. Connelly), 112 (V. Connelly).  *See also Haag Dep*. at 117-18, 123-24.

[41]*Init'l Contempt Hr'g Tr*. at 24-25 (Romp).  *See also Romp Dep*. at 32, 78-80; *M. Connelly Dep*. at 38-39; *Haag Dep*. at 117-18, 41-42 ("There was nothing left when they left. . . . We had to start from scratch.").

[42]*Init'l Contempt Hr'g Tr*. at 25 (Romp).

[43]*M. Connelly Dep*. at 40-46.

[44]*Haag Dep*. at 18.

[45]*Romp Dep*. at 18-19.

[46]*Haag Dep*. at 26.

of the business, and the attention the case received in the local media, the Court finds the

Connellys' claim that they knew nothing about the Consent Decree <u>not</u> credible.  The Court

concludes that the Connellys had at least constructive knowledge of the Consent Decree; they

had actual knowledge that the Decree prohibited them from possessing Crown drawings and

from manufacturing Crown parts; and they knew that these prohibitions resulted from a

settlement of Crown Cork & Seal's claims against Brau.

    Next, the Connellys argue that they cannot be bound by the Consent Decree

because they are not parties to the Decree, they are no longer bound as employees of a party, and

there is no other basis upon which to find them bound by it.  Adcor argues that they are bound by

the Decree because they are in privity with the Brau Defendants, or their successors.  No one

disputes that employees of a party that has entered into a consent decree are bound by that the

terms of that decree while they are in that party's employ.  However, former employees of a

party that is subject to a consent decree are not bound by that decree merely because they used to

work for that party.  More is required.

    In order to show that a non-party to a consent decree is bound by that decree, the

party so asserting must show that the non-party either aided and abetted the enjoined party in the

prohibited conduct, or must be legally identified with the enjoined party.  *Microsystems*

*Software, Inc.,* 226 F.3d at 43.  Thusfar, there is no evidence that the Connellys aided and

abetted Haag and Romp in the Brau Defendants' illicit scheme, or vice versa.

    Persons can be legally identified with an enjoined party as successors in interest.

*G. & C. Merriam Co.,* 639 F.2d at 36.  In order to be subject to a consent decree as a successor,

the successor must be one who has received a transfer of the business or some part of it from the

enjoined party.  *Id.; Saga Int'l, Inc.,* 984 F.Supp. at 1288.  It is not necessary to show that the non-party to a consent decree acquired all the assets of the predecessor, or that the non-party formally took over the predecessor's business.  *See Vulcan*, 658 F.2d at 1111.

Furthermore, a non-party to a consent decree can also be legally identified with an enjoined party if a court finds that both are in privity with each other.  *Saga Int'l, Inc.,* 984 F.Supp. at 1286.  *See also Vulcan, Inc. v Fordees Corp.,* 450 F.Supp. at 41-42.  The question of whether privity exists in a given case is a question of fact.  *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, 1109 (6th Cir. 1981) (citations omitted).  In *Vulcan*, the Sixth Circuit explained that privity is "an ambiguous term, a shorthand designation for those persons who have a sufficiently close relationship with the record parties to be bound by the judgment."  *Id*. (inner quotation marks omitted).

Here, clear and convincing evidence shows that after 1988 but while still employed at Brau, the Connellys started a new company called Bevcorp Industries.  They left Brau in 1992 to devote their full time to their new company, which openly advertised that it was in the business of manufacturing parts for Crown beverage fillers.  In 2000, the Connellys purchased the building and equipment of Brau  They later moved to Haag and Romp's Willoughby storage facility those items in the building which they did not purchase.  Among those items was a safe which had been present at Brau in 1987.  Contained in the unlocked safe were 1,100 drawings of Crown parts with Crown legends, Brau legends, and notched-out legends.  Evidence presented by Adcor at the Supplemental Contempt Hearing and thereafter suggests that Crown or Brau drawings migrated to the Connellys' customers through Bevcorp.  *See ECF No. 175*.

Until the discovery in May 2005 of the 1,100 Crown drawings contained in the Brau safe, the Court was prepared to conclude that the Connellys were not bound by the Consent Decree, and that the predicate for a contempt finding did not exist.  Adcor had not demonstrated that the Connellys and Bevcorp were either successors to Brau, in privity with Haag and Romp, or had acted in concert with Haag and Romp in any way.

The existence of the 1,100 Crown or Crown-derivative drawings clouds the issue. The Court has found that Haag and Romp's testimony as to these drawings is not credible, and the Court cannot at this point accept the Connellys' blanket denials of any knowledge.

The Court believes that the proof will be found not in the Connellys' words but in their conduct.  Accordingly, if Adcor wishes to continue to pursue this contempt motion against the Connelly Defendants, the Court hereby directs the parties to focus their attention in discovery as follows:

1.  Determine whether Bevcorp is making any of the parts represented by the 1,100 Crown or Crown-derivative drawings found in the Brau safe.

2.  If the answer is yes, compare the drawing for any part that Bevcorp is making with the Crown drawing to see if they are identical.

3.  If the drawings for any of the parts are identical, can Bevcorp produce evidence to demonstrate that they did not copy the Crown or Crown-derivative drawing.

With respect to the issue of laches, the Court finds that the Consent Decree in this case is a permanent injunction subject to continued judicial enforcement.  While there is no statute of limitations on the commencement of civil contempt claims, the equitable defense of laches may apply and is left to the sound discretion of the trial judge.  In order to establish

-41-

laches, the Defendants must show that Adcor unreasonably delayed in bringing its contempt claim against the Connelly Defendants and that they were prejudiced by the delay.  The Court notes that the Connelly Defendants may have difficulty showing prejudice since they would have done nothing but profit from their alleged use of Crown drawings.  However, the Court need not determine whether laches applies unless and until it determines that the Connellys have been using any of the drawings recently found in Haag and Romp's safe.

Accordingly, the Court is deferring ruling on the motion for contempt articulated in Count IV with respect to the Connelly Defendants.

### D.    COUNT V – Conspiracy to Violate the Consent Decree

The Court has concluded that Haag and Romp violated the Consent Decree by holding on to 1,100 drawings they were required to return under the Consent Decree.  At this point in the litigation, there is insufficient evidence to determine whether the Connellys violated the Decree and no tangible evidence that Haag and Romp conspired with the Connellys to violate the Decree.  Although it would be premature to make this determination at this time, the Court observes that it is not likely that any additional remedy would flow from a finding of conspiracy.

Accordingly, the Court is likewise deferring a ruling on whether or not the Defendants conspired to violate the Decree.

### IV.    CONCLUSION

The Court recognizes that the time frame and boundaries of an injunction are not limitless, and the Court does not take its contempt powers lightly.  I undertake this responsibility

-42-

as a representative of the court which has a unique and independent interest in seeing its orders enforced, *Electrical Workers Pension Trust Fund*, 340 F.3d 373, 385 (6th Cir. 2003) – not as an agent of one of the parties.  Given the criminal background which precedes this case, the recent unexplained discovery of drawings in an unlocked safe in a storage facility (also unlocked) to which Haag, Romp and the Connellys had access, and evidence suggesting that Crown and/or derivative drawings may have migrated to the Connellys' customers via Bevcorp, I have concluded that Adcor may continue to pursue discovery on the limited basis set forth *supra*, at 41-42, should it choose to do so.

Based on the foregoing, Bevcorp, LLC and the Connelly Defendants' Motion for Summary Judgment (**ECF No. 135**), asking the Court to dismiss the trade secret claim against them in Count I is hereby **GRANTED**.  Although Haag and Romp did not file a summary judgment motion with respect to Count I, the Court is entering judgment in their favor and against Adcor for the reasons set forth *supra*, at 22-23.  With this, Count I is **DISMISSED WITH PREJUDICE IN ITS ENTIRETY**.

The motion for contempt presented in Count IV is **GRANTED** with respect to Defendants Baron Haag and Chester Romp.  *See briefing schedule supra*, at 35.  The Court is deferring ruling on this motion with respect to Defendants Michael and Victoria Connelly, Miconvi Industries, Inc. and Miconvi Properties, LLC, and Bevcorp, LLC, pending discovery.

Finally, the Court is also deferring its ruling with respect to the conspiracy claim presented in Count V.

**IT IS SO ORDERED.**


*/s/Dan Aaron Polster    November 10, 2005*

**Dan Aaron Polster**

**United States District Judge**