**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ADCOR INDUS., INC.,** | ) | **Case No.  1:03 CV 1901** |
| | ) | |
| **Plaintiff,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **BEVCORP, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Before the Court are the following cross motions for summary judgment:

- Bevcorp LLC and the Connelly Defendants' Motion for Judgment on Counts
  IV & V ("Bevcorp Motion") (**ECF No. 231**), and

- Adcor's Industries, Inc.'s Motion for Summary Judgment and Request for
  Hearing ("Adcor Motion") (**ECF No. 243**).

For the following reasons, Bevcorp's Motion is **GRANTED**, Adcor's Motion is **DENIED** and

the case is **DISMISSED WITH PREJUDICE** in its entirety.

**I.**

This case arises from a Consent Decree entered in March 1988 in *Crown Cork & Seal*

*Co, Inc v Brau Mfg, Inc, Haag & Romp Design Engineering Consultants, Baron Haag and*

*Chester Romp*, Case No. C87-3300 (Krenzler, D.J.).  *See Am. Compl., Ex. A* ("Consent Decree").

Baron Haag and Chester Romp, defendants in the instant case, were defendants in *Crown Cork*

*& Seal*, along with their companies Brau Manufacturing ("Brau") and Haag & Romp Design

Engineering Consultants (collectively, the "Brau Defendants").  In the Consent Decree, Haag and Romp admitted that, beginning in 1967, they paid employees of Crown Cork & Seal over $300,000 to obtain drawings of Crown parts and other proprietary information.  *Id.* ¶¶ 1-6.  They admitted using the drawings to manufacture replacement parts for Crown beverage fillers, and to create their own drawings for the same parts – all of which enabled them to compete unfairly with Crown in the marketplace.  *Id*. ¶ 3.  Haag and Romp also peaded guilty to federal criminal charges stemming from this scheme.

While the Decree allowed Haag and Romp to remain in the business of repairing and reconditioning beverage fillers, including Crown fillers, it prohibited them from manufacturing or obtaining other than from Crown, any Crown parts for this purpose, and from using any of the trade secrets or knowledge illegally obtained in furtherance of such business.  *Consent Decree* ¶ 10.  The Decree required Haag and Romp to inform their employees, customers, the trade and the public that they had forever withdrawn from the business of manufacturing Crown parts and, to the extent such parts would be required in their repair or reconditioning business, they would use only genuine Crown parts purchased directly from Crown.  *Id*. ¶ 11(d).  The Decree also required them to promptly return to Crown all purloined drawings and other proprietary material in their possession, as well as any such documents that came into their possession in the future.  It prohibited them from replicating any documents pertaining to the manufacture of Crown parts.  *Id*. ¶¶ 11, 12.  Haag and Romp agreed that the Consent Decree and its prohibitions would apply not only to them, but to their "successors, assigns, affiliates, agents, representatives, heirs, administrators, executors, family members, and any person dealing directly or indirectly through them or in concert with them."  *Id.* ¶¶ 7, 9.

-2-

In 1991 and while still working at Brau Manufacturing, Defendants Michael and Victoria Connelly (respectively, the lead mechanic and executive assistant) started what became a series of businesses (Bevcorp Industries, Inc., Bevcorp Properties, LLC, Miconvi Industries and Miconvi Properties) to service, refurbish and sell replacement parts for, among other things, Crown beverage fillers.  *See ECF No. 99* at 2.  The Connellys continued to work for Brau until 1992, when they left Brau to devote their full time to their own businesses.  In May 2000, Bevcorp Properties purchased the real estate and certain equipment of Brau for $1.2 million, and moved into Brau's former building.  Shortly thereafter, at Haag and Romp's request, the Connellys had their employees move everything they didn't purchase to a Willoughby, Ohio storage facility rented by Haag and Romp.[1]

Meanwhile, in 1997, Simplimatic, Inc. purchased Crown's Machinery Division and the resulting company became known as Crown Simplimatic, Inc.  In 1998, Crown Simplimatic sued Adcor (the plaintiff in this case and a Crown competitor at the time), claiming that Adcor had misappropriated Crown drawings relating to a valve body which allegedly could not be made without Crown drawings.  The parties eventually settled that case and, in December 2000, Adcor acquired certain assets of the Crown entities, including its drawings, out of bankruptcy.

In 2003, Bevcorp launched a line of new beverage fillers which, according to Adcor, Bevcorp was incapable of manufacturing without Crown (or Crown-derivative) drawings or

---

[1]In November 2002, a company called Enprotech Corporation purchased the assets of Bevcorp Industries and formed an entity called Bevcorp, LLC.  The Connellys became officers of Bevcorp, LLC upon its formation.  Bevcorp Industries changed its name to Miconvi Industries, Inc. ("Miconvi Industries"), and Bevcorp Properties changed its name to Miconvi Properties, LLC ("Miconvi Properties").  Miconvi Properties leases to Bevcorp, LLC the real estate where the Bevcorp facility is now located and which was once owned and operated by Brau.  *ECF No. 80*, at 2.

other proprietary information.   Thus, on September 9, 2003, Adcor filed a complaint against the Connellys, their companies, Baron Haag and Chester Romp.  *ECF No. 1*.  The complaint alleged that Haag and Romp violated the Consent Decree by failing to return all Crown drawings in their possession, and by unlawfully providing those drawings and financial support to the Connellys who, in turn, paid Haag and Romp for their assistance.  *Id.* ¶¶ 23, 28, 33, 68.  Three months later, Adcor filed an amended complaint alleging the following five claims:  trade secret misappropriation (Count I), unfair competition (Count II), tortious interference with business contracts (Count III), breach of the Consent Decree (Count IV) and conspiracy to breach the Consent Decree (Count V).  *ECF No. 55*.

The Court dismissed Counts II and III in an order dated December 18, 2003.  *ECF No. 57*.  The contempt claims (Counts IV and V) were subsequently severed and tried to the Court on April 27, 2005, at the conclusion of which the Court directed the parties to file post-hearing briefs.  *ECF No. 106 and non-document entry of April 28, 2005*.  On May 4, 2005, Defendants filed a motion for summary judgment with respect to the trade secret claim alleged in Count I. *ECF No. 135*.

While the Court was in the process of drafting a ruling, Adcor filed a request for an emergency hearing and sanctions based on having located business records and approximately 1,100 Crown or Crown-derivative drawings (also referred to as "Brau drawings") in an unlocked safe in Haag and Romp's Willoughby storage facility – which facility was first identified in this case by Romp during the April 27th contempt hearing.  *ECF No. 145*.  According to Adcor president and owner, Demetrios Stavrakis, the safe was found in the middle of the warehouse, and the door to the safe was ajar but blocked by several large pieces of steel.  *ECF No. 258*

-4-

("Stavrakis Aff.") ¶ 4.  Stavrakis was able, with the help of a pallet jack, to move the steel far

enough away from the safe to allow him to open the door partway – where he discovered and

retrieved a large number of engineering drawings.  *Id*.  The next day, Stavrakis was able to fully

extend the drawers contained in the safe.  *Id*. ¶ 7.  He then discovered that additional drawings

were hidden under opaque plastic tabbed sheets.  *Id*.  The plastic sheets were fitted to the

drawings' dimension and appeared to be drawer bottoms.  *Stavrakis Aff.* ¶ 7.  When Adcor

employee Michael Brown lifted the plastic sheets, additional drawings were found between

cardboard sheets, also fitted to the drawers' dimensions.  *Id*.  Nearly all the drawings discovered

in the Brau warehouse were located in the safe.  *Id*. ¶ 10. This is the same safe used by Brau

when the Connellys worked there.  The Court granted Adcor's request and held a supplemental

contempt hearing on June 22, 2005.  *ECF No. 147*.  During the hearing, Adcor produced the

drawings and presented evidence suggesting that some Brau drawings migrated to one of

Bevcorp's customers through Bevcorp.  *See Supp'l Contempt Hr'g Tr.* at 125-158.  At the

conclusion of the hearing, the Court allowed the parties to file post-hearing briefs.

On November 10, 2005, the Court issued a memorandum of opinion and order that

(1) dismissed Count I as barred by the four-year statute of limitations for trade secret claims,[2]

(2) held Haag and Romp in contempt of court for violating the Consent Decree and fined each

man $100,000, and (3) deferred ruling on the question of whether the Connellys were bound by,

or had violated the Consent Decree, individually or in concert with Haag and Romp.  *ECF No.

180*.  In explaining the decision to defer ruling, the Court observed that,

_____

[2]In so holding, the Court relied not only on the case law, but on the parties' agreement, that
Adcor stood in the shoes of the Crown entities for purposes of the limitations statute.  *See ECF No.
180* at 8-9 n.3.

[u]ntil the discovery in May 2005 of the 1,100 Crown drawings contained in the Brau safe, the Court was prepared to conclude that the Connellys were not bound by the Consent Decree, and that the predicate for a contempt finding did not exist. Adcor had not demonstrated that the Connellys and Bevcorp were either successors to Brau, in privity with Haag and Romp, or had acted in concert with Haag and Romp in any way.

*Id.* at 41.  With this, the Court directed the parties to focus their attention in discovery on the following issues:

1.    Determine whether Bevcorp is making any of the parts represented by the 1,100 Crown or Crown-derivative drawings found in the Brau safe.

2.    If the answer is yes, compare the drawing for any part that Bevcorp is making with the Crown drawing to see if they are identical.

3.    If the drawings for any of the parts are identical, can Bevcorp produce evidence to demonstrate that they did not copy the Crown or Crown-derivative drawing.

*Id*.   Discovery has now concluded and the Court has reviewed the briefs, the evidence and the record, and is prepared to issue its ruling.

## II.

The purpose of a contempt proceeding is to "enforce the message that court orders and judgments are to be taken seriously."  *Electrical Workers Pension Trust Fund v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 385 (6th Cir. 2003) (citing *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987)).

When a court seeks to enforce its order or supervise its judgment, one weapon in its arsenal is contempt of court.  *See NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir.1987).  Recognizing that the power "to punish for contempts" should not be used lightly, the Supreme Court has stated that this power "is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory."  *Gompers v. Buck's Stove & Range Co*., 221 U.S. 418,

450, . . . (1911).  Contempt proceedings enforce the message that court orders
and judgments are to be complied with in a prompt manner.  *Cincinnati Bronze*,
829 F.2d at 590.

*Id*. at 378-79 (parallel citation omitted).

Counts IV and V allege that the Connellys are in contempt of, and conspired with Haag

and Romp to violate, the March 1988 Consent Decree between Crown Cork and Seal and the

Brau Defendants.  To establish civil contempt, a claimant must prove by clear and convincing

evidence that the alleged contemnor violated "a definite and specific order of the court requiring

him to perform or refrain from performing a particular act or acts with knowledge of the court's

order."  *Cincinnati Bronze,* 829 F.2d at 590 (citations omitted).  Clear and convincing means

"a quantum of proof adequate to demonstrate to a 'reasonable certainty' that a violation has

occurred."  *Levin v. Timber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002).[3]  In applying this

standard, any ambiguities must be resolved in favor of the person charged with contempt.  *Grace

v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996).  The decision whether to hold a

person in contempt is within the trial court's sound discretion.  *Peppers v. Barry*, 873 F.2d 967,

968 (6th Cir. 1989).

Before determining whether the alleged contemnor has violated a consent decree, the

Court must ensure that the contemnor is in fact bound by that decree.  Federal Rule of Civil

Procedure 65(d) limits those persons who can be bound by a federal injunction.  Rule 65(d)

provides in pertinent part as follows:

_____

[3]Where a party has the burden of proof by clear and convincing evidence, that is also the
burden it must meet for each element of its claim to survive summary judgment.  *See Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

-7-

> Every order granting an injunction and every restraining order . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

*Id.*  The individuals who fill the roles of officers, agents, and employees of an enjoined entity are subject to the injunction only in their capacity as officers, agents, or employees.  *United States v. Hochschild*, 977 F.2d 208, 211 (6th Cir. 1992); *Floralife, Inc. v. Floraline Int'l, Inc.*, 807 F.2d 518, 519 (7th Cir. 1986) (citing 11 Wright & Miller, Federal Practice and Procedure § 2956 (1973)).  Once they leave the employment of the enjoined entity they are no longer bound by the injunction on that basis.  *See Additive Controls & Measurement Sys., Inc. V. Flowdata Inc.,* 154 F.3d 1345, 1352 (Fed. Cir. 1998); 11a Wright & Miller, Federal Practice and Procedure § 2956 (1995).

A non-party with notice of a court injunction can only be held in contempt if shown to be in concert or participation with the enjoined party.[4]  *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112 (1969); *In re NAACP, Special Contribution Fund,* Nos. 87-3366, 87-3673, 1988 WL 61504, at *5 (6th Cir. June 13, 1988); *Microsystems Software, Inc. v. Scandinavia Online AB,* 226 F.3d 35, 43 (1st Cir. 2000).  The non-party must be deemed to have aided and abetted the enjoined party in the prohibited conduct, or must be "legally identified" with the enjoined party.  *Microsystems Software,* 226 F.3d at 43.

In order to show that a non-party "aided and abetted" a party subject to the decree, the plaintiff must show that the non-party had actual knowledge of the judicial decree and violated

---

[4]The Sixth Circuit has provided little guidance regarding non-party liability under Rule 65(d).  Accordingly, this Court will review the published precedent of other Circuits that have considered this issue.

-8-

it, and that the challenged action was taken for the benefit of, or to assist, a party subject to the decree.  *Id*.; *Additive Controls,* 154 F.3d at 1353 ("Non-parties are subject to contempt sanctions if they act with an enjoined party to bring about a result forbidden by the injunction, but only if they are aware of the injunction and know that their acts violate the injunction . . . .") (internal citations omitted).

Persons can be "legally identified" with a party as successor or assigns.  *G. & C. Merriam Co. v. Webster Dictionary Co., Inc.,* 639 F.2d 29, 36 (1st Cir. 1980).  In order to be subject to contempt proceedings as successor, the successor must be one who has received a transfer of the business or some part of it from the enjoined party.  *Id.; Saga Int'l, Inc. v. Brush and Co., Inc.,* 984 F.Supp. 1283, 1288 (C.D. Cal. 1997) (the fact alone that a non-party continued working in the same line of business was inadequate to render his new corporation a successor in interest).  A non-party can also be "legally identified" with an enjoined party if both parties are in privity with each other.  *Saga Int'l, Inc.,* 984 F.Supp. at 1286; *see also Vulcan, Inc. v Fordees Corp.,* 450 F.Supp. 36, 41-42 (N.D. Ohio 1978).

> Generally speaking, privity exists when a third party's interests are so intertwined with a named party's interests that it is fair under the circumstances to hold the third party bound by the judgment against the named party.  Privity can arise if a third party had control over the litigation conducted by the named party, if his interests were adequately represented by the named party, or if some other implied or in-fact representation or alignment of interests existed between the parties . . . . The relevant inquiry is whether the person sought to be bound was directly involved in shaping the outcome of the prior litigation such that his interests were adequately represented."  *Id*. at 1287 (internal citations omitted).

*Saga Int'l. Inc.,* 984 F.Supp. at 1287 (internal citations omitted).  *See also Vulcan, Inc. v. Fordees Corp.,* 658 F.2d 1106, 1109 (6th Cir. 1981).

-9-

### III.

At the initial case management conference on December 16, 2003, the Court told counsel and the parties that it was most troubled by the possibility that the 1988 Consent Decree issued by Judge Krenzler may have been violated by one or more people.  The fact that it was issued nearly 20 years ago makes it more significant, not less, particularly when one considers that the criminal prosecution and civil case against Haag and Romp dealt with commercial bribery that went back another 20 years.  We are therefore dealing with the aftermath of illicit conduct that began nearly 40 years ago.

Because a federal court order is so important, and contempt of court is such a harsh remedy, the standard for proving contempt is exceptionally high.  The "clear and convincing" standard means that Adcor must prove to a reasonable certainty both that the Connellys were bound by the Decree and that they violated it.  The Court did not hesitate to find Haag and Romp in contempt, notwithstanding their age and infirmity, when Adcor discovered in a warehouse in 2005 a large number of Crown and Brau drawings that Haag and Romp were supposed to have returned to Crown back in 1988.  Even though Haag and Romp testified that they had no knowledge of these drawings, and that they never used them in their business, the only logical explanation is that they held on to a large number of the drawings long after the Decree was issued, and that they kept those drawings in their place of business for many years.

But for the discovery in May 2005 of the drawings in the warehouse, the Court would have concluded the contempt proceedings against the Connellys last year.  However, despite the Connellys' testimony that they had never seen any Crown drawings at Brau Manufacturing, they were unaware that Haag and Romp were using Crown drawings to manufacture Crown

-10-

replacement parts at Brau, they lacked knowledge about the Consent Decree and all its prohibitions, and they did not conspire with Haag and Romp to violate the Consent Decree, the Court gave Adcor the opportunity to prove that the Connellys had in fact acquired the drawings directly from Haag and Romp in a joint effort to circumvent the prohibitions of the Consent Decree, or that they were successors in interest to Brau based on their purchase of Brau's real estate and equipment, and acquisition of Crown/Brau drawings, in 2000.

Discovery has now concluded and the evidence is in.  There are two types of documents that were discovered in the Brau warehouse.  The first type consists of drawings (or blueprints) of various Crown parts which contain Crown title blocks, Brau title blocks, or drawings of Crown parts with the title blocks removed.  The second type of documents are charts that either bear the "Haag and Romp Design Engineering Consultants" legend or appear to have been created by Haag and Romp.  There are 17 pages of charts, some of which designate a gear name, the Crown part number, the module ratio or diametric pitch of the gear and the designation "involute."  The charts look, in pertinent part, like this:

| PART | NAME | FELLOWS STUB TOOTH FORM MODULE | INVOLUTE |
|------|------|-------------------------------|----------|
| 408467 | WORM FEED INTERMEDIATE PINION | 2.7214/2 | 20° |

The Court will address these two types of evidence (i.e., the drawings and the charts) separately.

(continued on next page)

-11-

### A.      Warehouse Drawings

The evidence shows that there were approximately 1,100 drawings found in the Brau warehouse that relate to 870 Crown parts.  Of the 1,100 drawings, Bevcorp produced drawings for 48 of those parts.  *Bevcorp Motion, Ex. A* ("V. Connelly Aff.") ¶ 2; *see ECF No. 242 for listing of parts*.  Of the 48 parts, Bevcorp has made and sold 44 of those parts as new.

*V. Connelly Aff.* ¶ 4.  Bevcorp began manufacturing all but five of the 44 parts long before the Connellys purchased the Brau property in 2000 and moved the Brau safe into the Willoughby warehouse.  *Id.* ¶ 5; *ECF No. 242, Ex. A*.  Including revisions and different versions, Bevcorp produced 57 drawings relating to all 48 parts.  *V. Connelly Aff.* ¶ 2.  The Court directed the parties to compare the Bevcorp drawings with the warehouse drawings to determine if they are identical.  *ECF No. 180*, at 41.

Adcor hired an engineering expert, Dr. Richard Loucks, to determine, within a reasonable degree of engineering certainty, (1) whether the Bevcorp drawings contained evidence of having been copied from the warehouse drawings, and (2) whether the Bevcorp drawings could have been created by reverse engineering.  *Adcor Motion, Ex. 15, Loucks Group Warehouse Drawings Evaluation Report* dated March 31, 2006 ("Loucks Report"),  at 1.  Dr. Loucks compared 84 warehouse drawings to 71 Bevcorp drawings (i.e., the 57 Bevcorp drawings initially produced by Bevcorp, 6 duplicates of those drawings which were enlarged for Adcor at Adcor's request, and 8 Bevcorp drawings produced by Bevcorp's vendors).[5]  Dr. Loucks created a "descriptive

---

[5]*See ECF No. 246,* at 3 n.1.

engineering methodology" to compare each pair of drawings,[6] employing the following codes for the following observations:

> A - Placement and position of the part is the same.
> B - Dimensions in fractional and decimal formats for the same features.
> C - Tolerances of critical dimensions are the same.
> D - Duplication of erroneous, unique or extraordinary information.
> E - Shop callouts are duplicated.
> F - Same material specified.

*Id*. at 9.  Dr. Loucks recorded his opinions in 60 distinct evaluations, each of which he concluded with a summary, the purpose of which was

> to provide an explanation of the observations such that the codes may not reveal, and to provide information regarding any additional features not provided for in the codes.  While the effort to review the drawings was done in an orderly and methodical fashion, some features not accounted for in the process may have been observed to cause a conclusion that there was evidence of duplication.

*Id*. at 10.

Dr. Loucks concluded that 15 of the 60 pairs of drawings showed absolutely no evidence of duplication.[7]  Of the remaining 45 pairs of drawings, Dr. Loucks opined that, within a reasonable degree of engineering certainty, 18 of the Bevcorp drawings contained "information obtained from the [warehouse] drawing."[8]  The evidence shows that Bevcorp first manufactured (or sold as new) all but one of the 18 Crown parts in or before 1999.  *Compare Loucks Report*

---

[6]Although Dr. Loucks occasionally compares more than one Bevcorp drawing to a warehouse drawing, and vice versa, the Court will reference them as "pairs" of drawings.  The report can be consulted to determine which evaluations compare more than 2 drawings.

[7]*Loucks Report*, Evaluation Nos. 1, 5, 6, 8, 9, 12-15, 24, 31-33, 43, 44.

[8]*Id*., Evaluation Nos. 2, 3, 4, 7, 18, 34, 38, 40, 47, 48, 50-55, 57, 59.

*with ECF No. 242*.  Dr. Loucks opined that, within a reasonable degree of engineering certainty, 22 of the Bevcorp drawings were "likely duplicated" from the warehouse drawings.[9] *Id*.  The evidence shows that Bevcorp first manufactured (or sold as new) all but two of the 22 Crown parts in or before 1999.  With respect to four of the last five pairs of drawings, Dr. Loucks asserted that "[a]lthough it is not possible to state within a reasonable degree of engineering certainty that there is evidence of duplication, the similarity in position placement is unusually coincidental."[10]  With respect to the final Bevcorp drawing, Dr. Loucks stated that "[t]his drawing is a blue print replica taken from the back side of a CCS drawing from August 18, 1950. Because it was reversed in the blue print copy machine, the image is partially obscured, and cannot be used for this evaluation."[11]  Accordingly, of the 40 parts manufactured by Bevcorp for which Dr. Loucks concluded that Bevcorp likely duplicated a warehouse drawing or obtained information from a warehouse drawing, Bevcorp started making 37 of the parts well before 2000, when the Connellys directed their employees to move material from the Brau offices into the warehouse.

The Court has reviewed Dr. Loucks' report, his affidavit, and the drawings.  Although there are numerous and striking similarities between the Bevcorp drawings and the warehouse drawings with respect to certain dimensions, tolerances, materials, treatment and notes, there are numerous differences between them as well, and it is undisputed that none of the drawings are identical.  *See Bevcorp Motion , Ex. B*.  Dr. Loucks concedes this point.  *Loucks Dep*. at 147.

---

[9]*Id.*, Evaluation Nos. 10, 16, 17, 20, 22, 23, 25-29, 35-37, 39, 41, 42, 45, 46, 49, 56, 58, 60

[10]*Id.*, Evaluation Nos. 11, 19, 21, 30.

[11]*Id.*, Evaluation No. 39.

-14-

Dr. Loucks' expert opinions are subject to challenge for a number of reasons. He employs a methodology that he invented for this litigation. *See ECF No. 240* ("Loucks Dep. I") at 126-28. He never used it before and he does not know anyone who has used it. *Id*. He has no prior training or experience making these types of determinations; he has made no effort to determine generally accepted methods for determining the source of information on a drawing; he has read no books or articles, attended no classes or seminars and sought no training of any kind on the matter. *Id*. at 108-110. He acknowledges that there are numerous obvious alternative explanations for the sources of the information on the Bevcorp drawings, but he did not consider them because Adcor confined the scope of his inquiry. *See Loucks Dep. I* at 79-93. And while Dr. Loucks may be an expert on the subject of reverse engineering, he is not an expert on the subject of duplication. *Id*. at 6-9.

Many of Dr. Loucks' conclusions are suspect because he views both matching and non-matching data contained in the drawings as evidence of copying. According to Dr. Loucks,

> [e]xamples of copying would be matching tolerances, exact matching material specification and matching or verbatim machinist calls (sawcut, Measurement over Pins). Some additional examples of copying would be: tolerances that were unilateral, but disguised in bilateral form; exact material alloy specification with a different heat treatment; tighter tolerances for a given feature; greater tolerances for parts that may accommodate a larger tolerance; and dimensions that deviate from the original, but do not affect the part's performance. Some of these "mistakes" could disguise an attempt to copy the drawing by intentional placement of an incorrect value on a feature's dimension where conformance with the incorrect value does not affect the part's overall performance.

*Id*. at 8. In other words, he considers both similarities and differences between the drawings as evidence that the Connellys copied the drawings.

-15-

The impact of Dr. Loucks' conclusions is further weakened by the recharacterization of his March 2006 conclusions in his June 2006 affidavit.  For instance, while he concluded in his March report that, within a reasonable degree of engineering certainty, 18 of the Bevcorp drawings contain information obtained from the companion warehouse drawing; he concluded in his June affidavit that the drawings contain "evidence of intentional duplication of some critical information, determined within a reasonable degree of engineering certainty."  *ECF No. 17, June 6, 2006 Affidavit of Richard B. Loucks* ("Loucks Aff. I") ¶ 5.  While he conclude in his March report that, within a reasonable degree of engineering certainty, 22 of the Bevcorp drawings were likely duplicated from the warehouse drawings; he concluded in his June affidavit that the drawings contain "overwhelming evidence of intentional duplication." *Loucks Aff. I* ¶ 4.  While he conclude in his March report that (with respect to 4 of the Bevcorp drawings) it was not possible to state within a reasonable degree of engineering certainty that there was evidence of duplication; he concluded in his June affidavit that these drawings contain "what appear[] to be clear evidence of intentional duplication; however, such a determination was beyond the capacity to be determined within a reasonable degree of engineering certainty."  *Id.* ¶ 6.  These conclusions are at best, confusing, and at worst, inconsistent.  To further complicate matters, when asked what degree of likelihood he required in order to conclude that something was true within a reasonable degree of engineering certainty, he responded that he required proof that something was more likely than not.  *Loucks Dep. I* at 76-77.

For all these reasons, the Court concludes that Dr. Loucks' opinions do not prove to a "reasonable certainty" that Bevcorp copied the warehouse drawings.

There is also no clear and convincing testimonial evidence that the Connellys acquired the warehouse drawings directly from Haag and Romp, or that the Bevcorp drawings were copied from the warehouse drawings.  Rather, the evidence shows that none of the people employed by Bevcorp to create its drawings (other than Michael Connelly) knowingly copied Crown or Brau drawings or obtained such drawings from the safe in Haag and Romp's warehouse.  Michael Connelly has admitted copying Crown drawings, ignoring the trade secret prohibitions in the title blocks and discarding them afterwards;  however, he has testified that he obtained drawings of Crown parts from customers, defunct breweries, catalogs and previous Brau vendors.  Adcor argues that Connellys' testimony, that Crown drawings fortuitously fell into his hands, is not credible.[12]  This position is undermined by Adcor's position, in previous litigations with Crown, that Crown's engineering drawings were not trade secrets because at least three of Crown's competitors (excluding Bevcorp and Brau Manufacturing) were using Crown drawings to manufacture Crown parts, and that there was a thriving industry of companies that made and sold Crown replacement parts.  *See, e.g., ECF Nos. 44, 65 and exhibits thereto*.  Adcor also argues that Michael Connelly's testimony that he cannot produce a single Crown drawing or recall a single individual from whom he acquired a Crown drawing also lacks

---

[12]In a last-minute effort to counter Michael Connelly's assertions that he obtained drawings of Crown parts from third parties, Adcor filed the affidavit of Robert Risley, a project engineer at companies that utilized Crown fillers, who avers that he cannot recall a single instance where he saw a Crown drawing for a filler or other Crown machine, and that Crown did not provide beverage plants with drawings of its filler parts.  *ECF No. 254, Risley Aff.* ¶¶ 12-13.  The Court notes that this is the second time in this litigation that Adcor has filed "evidence" long after discovery has concluded and the briefing schedule has elapsed without seeking leave of court.  *See ECF No. 256* at 3-5 (regarding supplemental Darby Affidavit).  Its alleged reason for filing this affidavit, the shifting defense theory, was known to Adcor in March 2006, long before Adcor filed its summary judgment motion.  Thus, the Court declines to consider the affidavit, but even with the Risley affidavit, Adcor's proof fails to meet the "clear and convincing" standard..

credibility.  While the Court has already deemed some of Connelly's testimony unreliable, the Court does not have the same problem with this testimony.  Connelly copied most of the drawings in the early- to mid-1990's, and there would be no reason for him to keep the drawings, once copied.

In any event, while the Court has previously found Michael Connellys' testimony lacking in credibility and Michael Connelly has admitted that he copied Crown drawings, it is too great a leap to find that there is clear and convincing evidence that the Connellys acquired the warehouse drawings from Haag and Romp, copied them, used them to make Crown parts, put the drawings back in the unlocked safe in the warehouse (both in plain view and hidden), put large pieces of steel in front of the safe and left the warehouse unlocked.

The Court has previously ruled that Adcor's trade secret claims are time-barred, as Adcor's predecessors in interest, Crown and Crown Simplimatic, were on notice prior to March, 1998 that the Connellys were using Crown trade secrets.  While Adcor understandably would like to merge its contempt claims into its trade secret claim, the Court must be careful not to do so.  To prevail on its contempt claims, Adcor must prove to a <u>reasonable</u> <u>certainty</u> that the Connellys acquired Crown and/or Brau drawings directly from Haag and Romp.  If the burden of proof were a lower standard, Adcor might prevail; under the clear and convincing/reasonable certainty standard which the Court must apply, it cannot.

After three years of litigation, there is little to no evidence that the Connellys aided and abetted Haag and Romp in violating the Consent Decree, i.e., that they took the challenged action for the benefit of, or to assist, Haag and Romp.  *Additive Controls,* 154 F.3d at 1353.  The undisputed evidence shows that, following the issuance of the Decree, Haag and Romp held a

-18-

single meeting during which they informed their employees that they were prohibited from manufacturing new Crown parts.  *See ECF No. 180* at 28 (for citations to the record).  They neglected to tell their employees, however, that, to the extent such parts would be needed to recondition Crown fillers, they must purchase those parts directly from Crown.  *Id*.  The undisputed evidence shows that, shortly after this meeting, Haag and Romp had their employees re-manufacture used Crown parts from memory, at times creating "rework" drawings based on the employees' recall of the parts' dimensions and tolerances.  *Id*.  Indeed, Haag and Romp both testified that it was their belief that they were <u>permitted</u> to re-manufacture used Crown parts under the Consent Decree.  So, there is no evidence that the Connellys aided and abetted Haag and Romp in an effort to violate the Consent Decree.

There is no evidence that the Connellys are bound by the Consent Decree because they were in privity with Haag and Romp, regardless of whether they obtained drawings from the Brau warehouse.  As previously explained, privity may arise if a non-party to a consent decree had control over the litigation conducted by the named party, if the non-party's interests were adequately represented by the named party, or if some other implied or in-fact representation or alignment of interests existed between the parties.  *Saga Int'l, Inc.,* 984 F.Supp. at 1287.  The question is whether the non-party was directly involved in shaping the outcome of the prior litigation such that his interests were adequately represented.  *Id*.  According to Adcor, *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106 (6th Cir. 1981)  is determinative of the reach of the Consent Decree to the Connellys.  *See Adcor Opp. Br*. at 8.

In *Vulcan*, Fordees entered a contract to construct a reline tower for U.S. Steel's Gary Works.  658 F.2d at 1108.  In order to construct the tower, Fordees purchased engineering

-19-

drawings to construct the tower from M&G Industrial Associates ("M&G"), the defendant in a then-pending patent infringement action brought by Vulcan, with full knowledge that the drawings were the subject of that action.  *Id*.  Because of the pending litigation, Fordees insisted that M&G indemnify it against liability for infringing the patent.  *Id*.  As a condition of its contract with U.S. Steel, Fordees agreed to hold U.S.Steel harmless from potential infringement claims.  *Id*.  The M&G case resulted in the entry of a consent decree in which, among other things, the court declared that the patent was valid and infringed, and M&G stipulated that the drawings it sold to Fordees infringed the patent.  *Id*.  Vulcan agreed to release M&G from liability for any acts of infringement completed before the date of the decree, intending by this clause to release Fordees from liability for the tower it was then building for the Gary Works. 658 F.2d at 1109.  After the decree was entered, M&G closed their business, and Fordees began to construct additional reline towers (including one for the Gary Works) employing the same drawings.  *Id*.  Again, Fordees agreed to hold U.S. Steel harmless against infringement claims. *Id*.  Vulcan then sued Fordees for patent infringement.  *Id*.  The question before the district court was whether the determination of patent validity in the Vulcan/M&G consent decree was *res judicata* with respect to Fordees.  658 F.2d 1107.  Fordees argued that it was not in privity with M&G and, therefore, was not bound by the determination of patent validity in the consent decree.  The district court disagreed, stating:

> [w]here, as here, during the pendency of a patent infringement suit, Fordees acquired from the defendant in the [earlier] suit property rights to designs and engineering and technical assistance permitting Fordees to manufacture the device which is the subject of that suit; where such acquisition is made with full knowledge of the pendency of the suit; where the defendant in the suit agreed to indemnify Fordees for any damages resulting from Fordees' infringement of the patent in suit; where the defendant in the suit agreed to indemnify Fordees for any damages resulting from Fordees' infringement of the patent in suit; where a

-20-

> consent judgment was negotiated in the action which benefited Fordees; and
> where the consent judgment holds the patent valid and infringed; the Court finds
> Fordees is in privity with the defendant in the suit.

658 F.2d at 1109.  The Sixth Circuit affirmed this conclusion.  In the instant case, no one has

argued, and there is no evidence, that the Connellys were knowingly involved in the criminal

misappropriation of Crown drawings by Haag and Romp prior to the FBI raid and entry of the

Consent Decree.  Thus, it cannot be said that they were involved in shaping the outcome of the

*Crown, Cork & Seal* case such that their interests were adequately represented.

Adcor contends that the Connellys are bound by the Consent Decree as successors in

interest to Haag and Romp.  Adcor must prove that the Connellys copied drawings they got

directly from Brau which would make them successors to Brau and therefore bound by the

Decree.  Adcor's primary theory is that the Connellys acquired these drawings in 2000, when

they purchased the land, a building and equipment from Haag and Romp and moved into the old

Brau premises.  At the same time, Adcor claims that it was not until 2003 that Bevcorp started

manufacturing large numbers of Crown parts and that the Connellys used the warehouse

drawings to launch this initiative.

The facts don't support this theory, however.  Of the 1,100 Crown/Brau drawings found

in the warehouse, Bevcorp only makes parts corresponding to 44 – 39 of which Bevcorp made in

the mid-90's.  Accordingly, any change in Bevcorp's manufacturing behavior in 2003 can't be

explained by the warehouse drawings.  Further, why would the Connellys have taken the

drawings in 2000, copied them, and then put the originals back in the warehouse, creating the

possibility that they would subsequently be discovered?  If they were as nefarious as Adcor

maintains, they would have destroyed the warehouse drawings after copying them.

The other possibility is that the Connellys took the drawings with them when they left Brau in 1992, copied them, and have been using them ever since to make Crown parts.  If this happened, however, why would the Connellys have kept these drawings for 8 years, and why would they have moved them from their prior offices to Haag and Romp's warehouse in 2000?  Michael Connelly testified that he acquired 25-30 Crown drawings, and perhaps more,  in the early 90's from vendors, suppliers and other sources, which he did copy and then discarded.  There would have been no need to keep the warehouse drawings either.  Michael Connelly would have known he was not supposed to have them.  Once he had copied them or incorporated the central dimensions into existing drawings, the logical thing to do would have been to discard the Crown/Brau drawings.[13]

### B.    Warehouse Charts

Adcor has devoted 70 pages of its 112-page Motion to the warehouse charts.  As previously noted, the charts contain certain gear information for 168 Crown parts.  *See supra,* at 11.  At Adcor's request, the Court ordered Bevcorp to produce any and all drawings in their possession for the parts listed on the charts.  *ECF No. 220.*  Bevcorp produced drawings for 78 of these Crown part numbers.  *Id.*

Adcor asked Dr. Loucks to review the charts to determine, within a degree of engineering certainty, whether the module/pitch information contained on the charts "was sufficient information to create the Crown parts identified in the [charts]."  *Adcor's Motion, Ex. 20, May 2,*

---

[13]Adcor also argues that the Court has *in rem* jurisdiction over all Crown drawings under the Consent Decree; thus, the Connellys may be held liable for contempt of court regardless of their non-party status.  *Adcor Opp. Br.* at 11.  Suffice to say that the cases cited by Adcor in support of this theory are distinguishable for reasons explained in Bevcorp's Reply Brief, at 5-6.

*2006 Affidavit of Richard B. Loucks* ("Loucks Aff. II") ¶ 5.  After reviewing the documents, Dr. Loucks opined that,

> [i]f one has the module, or in the case of the Fellows Stub Tooth Gear System, the ratio of modules, one is able to determine several values of tooth dimension, including addendum, dedendum, whole depth, circular pitch, circular thickness, and clearance.

*Id*.  The formula for calculating these values is located in  one of several machinist handbooks.

*Id*.  Dr. Loucks further opined that,

> [i]f one has the module ratio and the number of gear teeth (the number of teeth may be ascertained by simply counting the teeth on a used gear), one is able to determine additional gear dimensional values, including:  pitch diameter, outside diameter, chordal or corrected addendum, and chordal thickness.

*Id*. ¶ 6.  Again, the formula for calculating these particular values is located in one of several machinist handbooks.  Dr. Loucks concludes that,

> [a]s an engineer, I can state within a reasonable degree of engineering and mathematical certainty that the module information contained on documents identified on [the warehouse charts] is all that is necessary to calculate the addendum, dedendum, whole depth, circular pitch, circular thickness, and clearance for [] each of the Crown gears in question.  In addition, knowledge of the number of teeth of the gear, which may be determined by counting the teeth of the gear to be replaced, is sufficient to further calculate the pitch diameter, outside diameter, chordal or corrected addendum, and chordal thickness, which is all the information necessary to manufacture the gear as new as specified by the [warehouse charts].

*Loucks Aff.* ¶ 9.

From here, Adcor took the additional step of comparing the drawings produced by Bevcorp (in response to Adcor's discovery request) to Crown drawings not present in the warehouse.  Adcor reviewed the drawings "to determine if the module or diametrical pitch on the

-23-

Bevcorp drawings were identical to the module or diametrical pitch found on the [warehouse charts].  Additionally, the Bevcorp drawings were compared to Crown drawings to determine if the Bevcorp drawings had identical or similar gear data." *Adcor Motion* at 109.  According to Adcor, the warehouse charts " show that Brau possessed the information necessary to create these gear drawings, if not the drawings themselves." *Adcor Opp. Br.* at 16.  Moreover, "Bevcorp created these drawings by misappropriating the module information found on [the warehouse charts] and/or copying them directly from Crown or Brau drawings that they misappropriated when the Connellys were employees at Brau or found the safe in 2000." *Id.* at 15; *Adcor Motion* at 44.

As a result of its review of the Bevcorp drawings, Adcor determined that 35 of the 78 drawings recite the same module/pitch information contained on the charts as well as the same gear data in the same order set forth on Crown drawings not in the warehouse, and 41 of the 78 drawings recite the same module/pitch information as the charts, and contain "nearly identical" gear data as set forth on the Crown drawings not in the warehouse.[14]  *Id*. at 109-110   Adcor concludes,

> When compared with the gear data found in the warehouse documents, it is clear that information concerning a gear's diametric pitch and/or the module information was copied from these documents.  A review of the Bevcorp gear drawings, and comparing them with the Crown gear drawings, shows how exact the copying and misappropriation was at Bevcorp.

*Id*. at 43-44.

_____

[14]Adcor also states that 2 of Bevcorp's drawings are photocopies of the Crown drawings. *Adcor Motion* at 109-110.  The Court has reviewed the drawings and notes that they are not exact photocopies.

-24-

There are several problems with this evidence.  No one at Bevcorp has testified that they ever saw these charts, that they manufactured any gears using the information in these charts, or that they made any Bevcorp drawings from the information contained in these charts – and there is no expert testimony that the Bevcorp drawings utilized in this exercise were made from the information contained in the warehouse charts.  There is also no evidence that the Connellys gave the charts, or the information contained therein, to their gear-cutters who have been making gears for Bevcorp since 1992, long before the charts found in the safe were moved to the warehouse.  Two of the gear-cutters used by Bevcorp (Robertson Manufacturing and Precision Gear) made gears for Brau in the 1980's and have retained Brau drawings and gear data to this day.[15]  Although there is evidence that the gear-cutters referred to the Brau drawings when making gears for Bevcorp, neither gear-cutter informed the Connellys that they were doing so.[16]  Thus, there is absolutely no evidentiary connection between the warehouse charts and the Bevcorp drawings.

Further, Adcor's theory with respect to the warehouse charts has the same logical flaws as its theory with respect to the warehouse drawings.  If the Connellys had obtained these charts when they left Brau in 1992, why would they have kept them for 8 years after copying the drawings and then move them in 2000 to Haag and Romp's warehouse?  By the same token, if the Connellys had first discovered the charts in 2000, when they had people move things out of

---

[15]*See Yeaglin Dep.* 16-17; *Keller Dep.* 32-24; *Miller Dep.* at 72.

[16]*See Yeaglin Dep.*16-17, 23-26, 51-52, 151-52; *Keller Dep.* 32-24; *Miller Dep.* 79-80, 86-87, 97-98; *June 22, 2005 Hr. Tr.* at 144 (Smith testimony)..

the Brau facilities into the warehouse, why would they have put the charts back into the warehouse after copying them, creating the possibility they would be discovered?

## IV.

The Court recognizes that the time frame and boundaries of an injunction are not limitless, and the Court does not take its contempt powers lightly.  I undertake this responsibility as a representative of the court which has a unique and independent interest in seeing its orders enforced, *Electrical Workers Pension Trust Fund*, 340 F.3d 373, 385 (6th Cir. 2003) – not as an agent of one of the parties.  Given the criminal background which precedes this case, the recent unexplained discovery of drawings in an unlocked safe in a storage facility (also unlocked) to which Haag, Romp and the Connellys had access, and evidence suggesting that Crown and/or derivative drawings may have migrated to the Connellys' customers via Bevcorp, I permitted Adcor to conduct discovery on this final issue.

In all, Adcor has produced strong circumstantial evidence that at some time since the Connellys left Brau in 1992, they copied a number of Crown drawings to make Crown parts.  This is not enough.  To prove contempt, Adcor must present clear and convincing evidence showing that the Connellys aided and abetted Haag and Romp in violating the Consent Decree, they were in privity with Haag and Romp, or they were successors in interest to Haag and Romp.

There is substantial evidence that the Connellys misappropriated Crown's trade secrets after they left Brau in 1992.  The Court, in its November 2005 Memorandum of Opinion and Order, concluded that Crown was aware of the Connellys' conduct.  If nothing else, Michael Connelly has admitted that he copied Crown drawings that he received from other businesses, and that he completely ignored the prohibition against doing so contained on the Crown title

-26-

blocks.  *Adcor Motion, Ex. 8,* at 63-64.  After what happened to his former employers, one might think he would have a less cavalier attitude on this subject.  That the Connellys may be have misappropriated Crown's trade secrets beginning in the early 1990's, however, does not translate into clear and convincing evidence that they were bound by the terms of the Consent Decree and violated its prohibitions.

Based on the foregoing, Bevcorp LLC and the Connelly Defendants' Motion for Judgment on Counts IV & V (**ECF No. 231**) is hereby **GRANTED**, and Adcor's Industries, Inc.'s Motion for Summary Judgment and Request for Hearing (**ECF No. 243**) is hereby **DENIED** and the case is **DISMISSED WITH PREJUDICE** in its entirety.

IT IS SO ORDERED.

*/s/Dan Aaron Polster    August 23, 2006*
**Dan Aaron Polster**
**United States District Judge**